EVELYN B. BROWN, Administratrix of the Estate of MICHAEL RAY BROWN, Deceased v. EDWARD MICHAEL MOORE

No. 92

(Filed 14 April 1975)

1. **Death § 7— wrongful death — damages — award for present monetary value not required**

    In awarding damages for wrongful death the jury is not ordinarily required as a matter of law to award damages for all or any of the items specified in G.S. 28-174(a), (b) and (c) for consideration in determining the present monetary value of decedent to the persons entitled to the damages recovered.

2. **Evidence § 11— dead man's statute — transactions and communications with decedent — opening door by offering testimony**

    When plaintiff offered testimony in a wrongful death case relating to what happened during the evening of decedent's death from the time the witness, decedent and defendant got together until the wreck causing decedent's death, she thereby rendered competent testimony of defendant concerning the same transactions or communications but did not render competent testimony of defendant concerning what may have occurred between him and decedent on unrelated prior occasions.

3. **Evidence § 11— dead man's statute — testimony by third party — incompetent testimony by defendant**

    In an action to recover for the death of a passenger in an automobile driven by defendant which failed to negotiate a curve while traveling at a high rate of speed, G.S. 8-51 did not disqualify a third party from giving testimony otherwise competent concerning transactions and communications between decedent and defendant in the presence of the witness on occasions prior to the accident in question,

Brown v. Moore

and it was permissible for defendant to testify with reference to the transactions and communications referred to in such witness's testimony; however, defendant's testimony that decedent had accompanied him on numerous prior unidentified occasions when he drove his car to determine the maximum speed at which it could take the curves did not relate to transactions and communications involved in such witness's testimony and was incompetent under G.S. 8-51.

Justices COPELAND and EXUM did not participate in the hearing or decision of this case.

ON *certiorari* to review the decision of the Court of Appeals reported in 22 N.C. App. 445, 206 S.E. 2d 794 (1974), which found "no error" in the trial before *Long, J.,* at the 7 January 1974 Session of the Superior Court of GUILFORD County, High Point Division, docketed and argued as case No. 100 at the Fall Term 1974.

This action was instituted by the administratrix of the estate of Michael Ray Brown (Brown) to recover damages for the alleged wrongful death of her intestate.

Brown, aged 17, died 18 August 1972 from injuries he sustained in a one-car wreck on N. C. Rural Paved Road 1763 in Davidson County, North Carolina, about 11:55 p.m. on that date. The wrecked car was a 1962 Chevrolet four-door sedan, owned and operated by defendant, Edward Michael Moore (Moore), aged 19. Brown and Terry Gray (Gray), aged 17, were guest passengers. Moore, Brown, and Gray were good friends.

The wreck occurred at a curve 1.8 miles south of the intersection of Westchester Drive and Burton Street Extension in High Point, North Carolina. Moore had turned left from Westchester and was driving south towards Thomasville. For the distance of "about .7 of a mile" from the intersection to the Davidson County line, the speed limit was 35 miles per hour. South of the county line Burton became Rural Paved Road 1763. For a distance of "1.1 mile" from the county line to the curve where the wreck occurred, the speed limit was 55 miles per hour. The paved portion of the tar and gravel road was "17 feet wide" and the shoulder was "about 3 feet wide." There were two lanes, one for each direction of travel, but no lines on the road marked these lanes.

Earlier in the evening of Friday, 18 August 1972, Moore, Brown, and Gray, along with Moe (Tommy) Bugg and Dan

Bugg, went to the Midway Drive-In on the Old Thomasville Road. All of them left the Drive-In in Moe Bugg's car. Moe Bugg drove first to Moore's home. There Moore, Brown, and Gray got out of Moe Bugg's car and got into Moore's car. It was then "just about 15 minutes before the accident occurred." Moe Bugg drove ahead to the J & M Curb Market and got some gas. Moore followed him to the Curb Market. As Moe Bugg left the Curb Market, traveling on Westchester Drive, Moore "hollered out the window at him and told him not to go down Burton Street." However, Moe Bugg ignored this instruction, proceeded to the intersection, and made a left turn into Burton Street. Moore stopped at the intersection because the "light caught [his] car." When the light changed, Moore turned left into Burton Street. The occupants of the Moore car could see the tailights of the Moe Bugg car until to crossed the Davidson County line and "speeded up and took off."

Trooper J. Scott Irving of the State Highway Patrol arrived at the scene at 11:59 p.m., shortly after the wreck occurred. The investigation at the scene disclosed the following: The road curved sharply to the left for the southbound motorist. Moore's car was "probably about 50 feet off the road" to the right. It had struck a tree and come to rest beside a power pole and guy wire. It was resting "just a little bit past the center of the curve." Tire marks, which began on the road and continued to where the car struck the tree, measured 214 feet, "the largest portion . . . on the dirt." There was extensive damage to the right front side of the door, "the front end being twisted to the right." The right front door came completely off and was "just crumbled up." Brown was on the right hand side of the car. The lower half of his body was pinned in the car; the upper part was "hanging out of the car." Within a minute or two, Brown, Moore, and Gray were taken by ambulance to a hospital in High Point. Irving had no conversation with Moore or Gray at the scene of the wreck.

The night was clear. The road was dry and practically level both north and south of the curve where the wreck occurred. The point at which Moore went off the road was in the first or north portion of an "S" curve.

Irving testified there were five curves "from the county line to the scene of the wreck"; that a couple of them were "fairly sharp" but not as sharp as the curve where the wreck occurred; and that the road was "a narrow winding road."

Irving saw Moore (defendant) in the emergency room of the hospital about 1:30 a.m. On that occasion, Irving's only inquiry concerned the identity of the driver of the wrecked car. Moore "promptly told" Irving that he was driving. Moore was crying, was "very emotionally upset," and said "his best friend was dead," and that "he didn't care what happened to him." Moore was admitted to the hospital and remained there until the following Monday.

At the hospital, on Sunday afternoon, Irving talked with Moore again. According to Irving, statements then made by Moore included the following: When they started out, all three were in the front seat. Just before the wreck Gray got out of the front, got into the back and lay down on the floorboard in the back seat. They had been talking "about the curves on Burton Street." He did not know exactly how fast he was driving but was going "less than a hundred." He had drunk "a couple of beers."

Irving testified that he had detected a slight odor of alcohol on Moore's breath when he first saw him in the emergency room but he did not think he was under the influence of any intoxicant. He further testified that on 6 October 1972 Moore had "entered a guilty plea to exceeding a safe speed arising from the wreck."

Gray testified that he had had nothing to drink during the entire evening but that both Moore and Brown had drunk beer earlier. He further testified that Moore was not under the influence of any intoxicant. There was evidence that a sample of blood taken from Brown after his death "contained .05% of alcohol by weight." There was no testimony that Brown was under the influence of any intoxicant.

Gray testified that Moore speeded up when he got to the county line, "gradually kept on picking up speed," and began breaking the speed limit when it changed from 35 to 55. Gray further testified: "I had no notice prior to the time he started into the 55-mile zone on Burton Street that he was intending to speed through those curves out there. There had been no discussion between me and Mr. Moore and anybody else in that vehicle prior to the time we got into it about speeding on those curves on Burton Street Extension. Prior to the time he started speeding where the speed limit changed, I had no reason to fear riding with him. At the point where he did start speeding, I asked him

to slow down several times. He didn't say anything. He didn't slow down. As we started into the curve where the wreck happened, I told him, 'Since you are not going to slow down, I am going to get in the back'; so I started to get in the back and he told me he didn't blame me for getting in the back so I went ahead and got in the back seat. I mentioned the curve to him prior to approaching the curve and getting in the back seat. I told him there was a bad curve coming up and we might not make it. While I was climbing over the back seat and going into that curve, Mike Brown told Mike [Moore] to hold the car inside and work his way out in the curve. Mike Brown did not say anything else while we were on Burton Street Extension before that time. From the time we entered the 55 mile per hour zone to the time the car left the road in that bad curve, Mike Moore did not stop the car at any time. No one in the car had any opportunity to leave the car. Neither I, nor Mike Brown, did anything to encourage Mike Moore to speed out there."

Testimony relating to defendant's driving on occasions prior to the evening of 18 August 1972 will be set forth in the opinion.

Testimony pertinent to the issue of damages includes the following:

At the time of Brown's death, his father was 62 and his mother over 48. His father, a 30-year employee of Burlington Industries, received take-home pay of between $170 and $175 each two weeks. His mother had been unable "to go back in the mill" since her operation for a ruptured disc in April of 1972. She sold cosmetics "to help out a little." During the preceding five years, the parents had been buying a home. Their house payment (V.A. Loan) was $69.50 per month.

Brown had always lived in the home of his parents. At the time of his death, a brother, aged 22, and a sister, aged 10, also lived with the parents. A married brother, aged 28, had children of his own and lived elsewhere.

Brown quit school after finishing the seventh grade. "He was two years behind other children of his age." He worked 40 hours a week for the Albert Roofing Company at $2 per hour from 14 December 1970 until 27 July 1972, as a sheet metal helper. His employer described him as "a very good boy, a good worker." He was dependable, a sober boy, as far as he knew. He never came around him drinking.

Brown quit his job with Albert Roofing Company because he "had a little falling-out with the mechanic," and applied for a job with Lane Upholstery Company. On the Monday after his death, this company sought to notify him that his application had been accepted. He had been of out work two or three weeks before his death. The job with Lane Upholstery Company would have paid him $2 to $2.10 per hour for approximately 40 to 45 hours per week during a "training type program." A properly trained upholsterer could expect to earn from $4 to $6.50 per hour.

While employed, Brown bought his own clothes and gave his parents "about $25.00 each two weeks," which was "practically more or less just to feed him." He took out three insurance policies: (1) a $9,000 life policy in which his mother was named beneficiary, (2) a $1,000 life policy in which his father was named beneficiary, and (3) a disability policy. At times his mother paid some of the premiums.

All witnesses described Brown as "a fairly intelligent boy," and "a good boy." He got along well with other children, and nobody in the community had had any trouble with him. Brown's mother, the plaintiff, testified: "He was fairly intelligent. He conducted himself well and had a nice personality. Most everybody liked him and he was just wonderful to me and his father. He was good to do things around the house." He had helped his father "put on the roof of an outbuilding." He had painted the back porch; he mowed the grass and ran errands. He waited on and helped his mother during an illness.

Brown was a "strong and husky boy and had a chest on him like Tarzan." His health was good.

Brown had bought "a straight gear" 1955 Chevrolet, which stayed in the driveway of his parents' home. It had not been driven out "on the open road" because his mother "would not let him." Brown did not have an operator's license. He had not taken a "driver's training" course and therefore could not get a driver's license until his 18th birthday.

Brown did not have any money "to report in the Estate." On the night of his death "his father gave him a couple of dollars."

The issues submitted and the jury's answers are as follows:

"1. Was the plaintiff's intestate, Michael Ray Brown, injured by the negligence of the defendant, Edward Michael Moore?

"Answer: Yes

"2. Did Michael Ray Brown, by his own negligence, contribute to his injury?

"Answer: Yes

"3. Was the plaintiff's intestate, Michael Ray Brown, injured by the wilful and wanton negligence of the defendant, Edward Michael Moore?

"Answer: Yes

"4. What amount, if any, should the plaintiff recover of the defendant for compensatory damages?

"Answer: $2,756.84

"5. What amount, if any, should the plaintiff recover of the defendant for punitive damages?

"Answer: None."

When the jury first submitted its verdict, the answer to the fourth issue was worded as follows: "Expenses for funeral, burial plot and ambulance, as cited by the Court." The judge instructed the jury they would have to answer the issue in monetary terms. Counsel then stipulated the amount of these items and agreed that the jury might take the bills into the jury room for use in arriving at a monetary answer to the fourth issue. In the verdict as later returned, the fourth issue was answered $2,756.84," the exact total of these bills.

Plaintiff moved to set the verdict aside and for a new trial. After denying this motion, the court entered judgment that the plaintiff recover from the defendant the sum of $2,756.84 plus costs. Upon plaintiff's appeal therefrom, the Court of Appeals found "No Error." Plaintiff's petition for *certiorari* was allowed.

*Floyd & Baker by Walter W. Baker, Jr., for plaintiff appellant.*

*Henson & Elrod by Perry C. Henson and Joseph E. Elrod III, for defendant appellee.*

SHARP, Chief Justice.

On her appeal to the Court of Appeals, plaintiff assigned as error the court's refusal to set the verdict aside. *Inter alia,* she contended the award of damages was inadequate as a matter of law "because absolutely no value was placed on the life of plaintiff's intestate" and the court's refusal to set the verdict aside was "an abuse of discretion." With reference to this assignment, the Court of Appeals held that whether the verdict should be set aside was in the discretion of the trial judge, and the plaintiff had failed to show "an abuse of discretion." In this Court, plaintiff renews her contentions with reference to the asserted inadequacy of the verdict and brings forward all other assignments of error presented to the Court of Appeals.

The evidence, when considered in the light most favorable to plaintiff, was sufficient to support findings that Brown's death was proximately caused by the actionable negligence of Moore and that such actionable negligence was wilful and wanton. Also, considered in the light most favorable to defendant, the evidence was sufficient to support a finding that negligence on the part of Brown contributed to his death as a proximate cause thereof. Gray's testimony tended to show that he repeatedly protested the speed at which Moore was driving but to no avail; that Gray climbed over the front seat to a safer position in the back; that Brown did not protest Moore's speed or call upon him to slow down but gave directions to Moore with reference to *how* to take the curves at high speed.

The right of action to recover damages for wrongful death was created by and is based on the statute codified as G.S. 28-173. G.S. 28-174, as rewritten by Chapter 215, Session Laws of 1969 (1969 Act), sets forth the items for which damages are recoverable. It does not purport to identify the beneficiaries of such damages as the jury may award. The distribution of whatever recovery is obtained is governed by the provisions of G.S. 28-173. *Bowen v. Rental Co.,* 283 N.C. 395, 196 S.E. 2d 789 (1973). The opinion in *Bowen* sets forth the full text of G.S. 28-173 and sets forth in full all provisions of the 1969 Act, codified as G.S. 28-174.

G.S. 28-174(a) provides: "Damages recoverable for death by wrongful act include:

"(1) Expenses for care, treatment and hospitalization incident to the injury resulting in death;

Brown v. Moore

"(2) Compensation for pain and suffering of the decedent;

"(3) The reasonable funeral expenses of the decedent;

"(4) The present monetary value of the decedent to the persons entitled to receive the damages recovered, including but not limited to compensation for the loss of the reasonably expected:

"a. Net income of the decedent,

"b. Services, protection, care and assistance of the decedent, whether voluntary or obligatory, to the persons entitled to the damages recovered,

"c. Society, companionship, comfort, guidance, kindly offices and advice of the decedent to the persons entitled to the damages recovered.

"(5) Such punitive damages as the decedent could have recovered had he survived, and punitive damages for wrongfully causing the death of the decedent through maliciousness, wilful or wanton injury, or gross negligence;

"(6) Nominal damages when the jury so finds."

There was no evidence concerning expenses recoverable under (1) unless the ambulance bill of $23 is so considered. Injury and death having occurred simultaneously, there was no basis for recovery under (2) on account of the pain and suffering of the deceased. The verdict provided for the recovery under (3) of funeral expenses. Although punitive damages are recoverable under (5) under specified conditions, the jury elected to make no award therefor. Since the jury awarded actual damages, the provisions of (6) relating to nominal damages are inapplicable.

In the present factual situation, whether the verdict should have been set aside as a matter of law on the ground of inadequacy of the award depends upon the answer to this question: Assuming plaintiff's right to recover, was she entitled *as a matter of law* to recover *some amount* of damages for all or any of the items set forth in G.S. 28-174 (a) (4) (a), (b) and (c), when there is any evidence upon which such recovery *could be based?* The court instructed the jury that damages were recoverable for these items. However, the jury did not see fit to award damages therefor.

Subdivisions a, b, and c of G.S. 28-174(a)(4) enumerate *some* of the factors to be considered in determining "[t]he present *monetary* value of the decedent to the persons entitled to the damages recovered." (Our italics.) Obviously, damages for any of these items, unless the decedent was a person of established earning capacity beyond his or her personal needs, involve in large measure speculative and intangible considerations.

The present monetary value of the decedent to the persons entitled to receive the damages recovered will usually defy any precise mathematical computation. 22 Am. Jur. 2d Death § 267 (1965). Therefore, the assessment of damages must, to a large extent, be left to the good sense and fair judgment of the jury —subject, of course, to the discretionary power of the judge to set its verdict aside when, in his opinion, equity and justice so require. *See Walston v. Greene,* 246 N.C. 617, 99 S.E. 2d 805 (1957); 25A C.J.S. Death § 115 (1961). The fact that the full extent of the damages must be a matter of some speculation is no ground for refusing all damages. *See Bowen v. Rental Co.,* 283 N.C. at 419, 196 S.E. 2d at 805-806. Notwithstanding, where actual pecuniary damages are sought, the plaintiff must satisfy the jury by the greater weight of the evidence of the existence of damages and of facts which will furnish some basis for a reasonable assessment. *Lieb v. Mayer,* 244 N.C. 613, 94 S.E. 2d 658 (1956). "[T]he damages in any wrongful death action are to some extent uncertain and speculative. A jury may indulge in such speculation where it is necessary and there are sufficient facts to support speculation. Conversely, damages may not be assessed on the basis of sheer speculation, devoid of factual substantiation." *Gay v. Thompson,* 266 N.C. 394, 398, 146 S.E. 2d 425, 428 (1966). *A fortiori,* a jury will not be required to award damages when the evidence adduced does not establish to its satisfaction facts which will reasonably support an assessment. In such a situation, by Subsection (6) the Legislature *authorized* "[n]ominal damages *when the jury so finds.*" (Our italics.) Permission is granted; no command is given.

In every wrongful death action, as in other suits for damages, and as the judge did here, the court instructs the jurors that they are the sole judges of the facts; that the plaintiff must satisfy the jury by the greater weight of the evidence the amount of damages, if any, that he is entitled to recover for the death of his decedent; that otherwise they will answer the issue of damages "Nothing." *See Paris v. Aggregates, Inc.,*

271 N.C. 471, 157 S.E. 2d 131 (1967). The jurors being "the sole judges of the facts" are necessarily the sole judges of whether they are "satisfied from the evidence and by its greater weight" that plaintiff sustained damages and, if so, whether there is evidence from which they can reasonably determine the approximate amount of the plaintiff's pecuniary loss.

[1] We hold, therefore, that in awarding damages for wrongful death the jury is not ordinarily required *as a matter of law* to award damages for all or any of the items specified in a, b, and c of G.S. 28-174(a) (4). It is only when the jury has arbitrarily disregarded the law and the evidence that the judge must exercise his judicial discretion and set the verdict aside.

On her appeal to this Court plaintiff contends that the decision of the Court of Appeals is in conflict with our decision in *Robertson v. Stanley,* 285 N.C. 561, 206 S.E. 2d 190 (1974), and should be reversed for that reason.

*Robertson v. Stanley, supra,* is distinguishable in the respects noted below. In *Robertson,* the separate actions grew out of the serious injuries sustained by a nine-year-old boy who survived. His injuries necessitated operations and hospitalization. Medical and hospital bills incurred by the boy's father for the treatment of the boy's injuries amounted to $1,970. The boy's action for personal injuries, including pain and suffering, and the father's action to recover for medical and hospital expenses (stipulated to be $1,970) were consolidated for trial. After answering the issues of negligence and contributory negligence in favor of the plaintiffs, the issue of damages in the father's case was answered "$1,970." The issue of damages in the boy's case was answered "none." Since the boy's personal injuries, including pain and suffering, were established facts, this Court held "the verdict [was] contrary to law, inconsistent, invalid and should have been set aside *ex mero motu." Id.* at 564, 206 S.E. 2d at 192.

Here, as also in *Bowen, supra,* there was no interval between decedent's injury and death and thus no pain and suffering. Further, the evidence tending to show "the present monetary value" of Brown to his parents was inconclusive.

Since a new trial is awarded on other grounds, we do not consider plaintiff's contention that the court's failure to set aside the verdict on account of inadequacy of the award was an abuse of discretion.

Brown v. Moore

Plaintiff renewed in this Court her contention that her case was substantially prejudiced by the admission over her objection of incompetent evidence. This evidence consists (1) of testimony elicited by defendant's counsel during his cross-examination of Terry Gray and (2) of defendant's testimony on direct examination. This testimony, together with testimony first received and later stricken, was offered to show that Brown was accustomed to riding with Moore; that, on previous occasions, Moore, accompanied by Brown, had driven his car on many roads to determine the maximum speed at which he could "take the curves"; that Brown had continued to ride with Moore notwithstanding his knowledge of Moore's habit and practice in "taking the curves"; that Brown voluntarily got into Moore's car on the night of 18 August 1972 to "ride around"; that notwithstanding Moore drove with accelerating speed along the curves of Rural Paved Road 1763, Brown did not protest but gave directions as to the proper way to negotiate the curve; and that, under these circumstances, if the negligence of Moore was wilful and wanton, the contributory negligence of Brown was also wilful and wanton.

Defendant's allegations of contributory negligence relate solely to Brown's failure to protest the manner in which Moore was operating his car on the evening of 18 August 1972 and his failure "to remove himself from a place of known and obvious danger despite numerous opportunities to do so in safety." Defendant did not allege that Brown's contributory negligence was wilful and wanton; nor did he allege any facts concerning his own driving on any prior occasion in the presence or absence of Brown.

In cross-examining Gray, defendant's counsel asked whether he, Brown, and Moore, prior to the night of 18 August 1972, had been together in Moore's car when Moore had "taken the curves on any other street in this area." Plaintiff's objections having been overruled, Gray answered that they had been together "maybe twice" when Moore had "taken the curves" on Rotary Drive, "a real curvy road . . . hard to take at high speeds"; that on one of these occasions, when they were going "maybe 50," they hit a bump in the road and "[t]he wheels came off the ground and the car slipped sideways" and stopped "against the curb."

The testimony of defendant on direct examination relating to prior conversations and transactions with Brown is set forth below:

Defendant was asked: "Can you tell us what kind of motor [defendant's 1962 Chevrolet four-door sedan] had in it, how it was equipped, and so forth?" Over plaintiff's objection, defendant answered: "Well, the car was, had a 283 in it, three-quarter cam with a double barrel, and I had it geared for drag, it would run 110 miles per hour wide open." Thereupon, defendant was asked: "Did your friend, Mr. Brown, know that?" Prior to plaintiff's objection, defendant had answered to this extent: "Yes, sir, he knew it. He was one that really encouraged me to gear it like that. We talked about cars all the time. He said, 'Mike, it would be best—' "

At this point defendant's testimony was interrupted by plaintiff's objection on the ground the testimony was incompetent under G.S. 8-51. After a colloquy with counsel, the court ruled that defendant could be examined "with regard to what type automobile he had, what type engine, and that sort of thing." After announcing his ruling, the court stated: "I will sustain the objection." Thereupon, upon motion of plaintiff's counsel, the court instructed the jury as follows: "Members of the Jury, you will not consider this witness's testimony as to what the deceased person may have encouraged him to do about his automobile or engine."

After testifying fully concerning what had occurred on the night of 18 August 1972, which included testimony that the tachometer indicated his speed was "between 70 and 75" shortly before the wreck, defendant was asked: "Now, then, on previous occasions prior to this night had you been with Mr. Mike Brown on other streets in and around the City of Greensboro where you all had taken some curves?"

Upon plaintiff's objection, the court stated: "Well, the door has been opened as to previous occasions on Rotary Drive. If you would limit your examination—"

After a brief recess, defendant testified, in response to his counsel's questions, that he had heard Gray testify "about *some* other occasions on Rotary Drive here in High Point about [Moore] and [Gray] and Mike Brown being together." (Our italics.) When defendant was asked to "tell the jury about that

episode and *those* occasions," (our italics) plaintiff objected. Overruling plaintiff's objections, the court instructed the jury as follows:

"Members of the Jury, I instruct you that this evidence will be considered by you insofar only as it may tend to support or corroborate the testimony of the witness, Terry Gray, who testified about the *same* matters yesterday. It is not to be considered by you for any other purpose." (Our italics.)

Thereafter, defendant testified as follows: "Well, a street back over in Emerywood section, Rotary Drive, and it consists of a few S-curves down through there, and well, just about every Saturday night *we* would go down through them." (Our italics.)

Plaintiff objected again, stressing the point that there was nothing in Gray's testimony about "every Saturday night" and defendant's testimony did not corroborate the testimony of Gray. Overruling this objection, the court instructed the jury as follows:

"Members of the Jury, you will not consider any evidence which does not corroborate the testimony of Terry Gray insofar as this may vary from his testimony; you are not to consider it as substantive evidence in any way."

Thereupon, defendant testified: "Just about every Saturday night, I am not sure, some nights we might skip a night— *we* would go down through them curves and sometimes I would go down through them by myself." Defendant's further extensive testimony was to the effect that he and "all the boys up to about seven" had driven through unidentified curves at various speeds.

With reference to the occasion when, according to Gray, Moore's car had slid sideways into the curb, defendant testified: "[I], Donnie Presnell and Terry Gray came up over the drive and there was leaves or something on the road and the car turned sideways and it started sliding, and I straightened it back up and the back wheels slid up against the curb and just touched it and come back around. I wouldn't turn the wheel, I could whip it one way and the other and got it straight and kept on going. The only thing said about that was '[w]e about lost it.' "

When plaintiff objected to the portion of this testimony which did not corroborate Gray, the court stated: "The jury has been instructed concerning that."

At this point, the record shows the following: "The Jurors retired to the Jury Room. In the absence of the Jury, it was clarified that when the car slid sideways on Rotary Drive that only Terry Gray and Donnie Presnell were with the witness *and that Mike Brown was not present.*" (Our italics.)

When the jury returned, the court gave the following instruction: "Members of the Jury, in your absence I have AL-LOWED a motion to strike a portion of the testimony of· this witness relating to the time he lost control of his car temporarily and it slid to the side of the street and hit the curb.and he was whipping the steering wheel back and forth to get it straightened out. It appears from the record that the deceased, Mike Brown, was not in the automobile on that occasion, and it is not competent as evidence in this case and you should disregard the testimony of this witness concerning that event."

After defendant had testified that Brown was not present with him, Gray and Presnell on the occasion referred to in Gray's testimony, he was asked concerning occasions when Brown was with him when he was driving on Rotary Drive. Although defendant did not identify any particular instance and stated he was unable to state the number of such instances, the thrust of his testimony was that Brown had been with· him on such occasions over a period of four years.

Defendant was asked: "Was there any other street¦other than Rotary Drive where the curves were being taken at certain speeds when Mike was present—before the accident?" Plaintiff's objection having been overruled, defendant answered: "In the City, just Rotary Drive. Outside the City, it is a country road out there going towards my brother-in-law's house and he was with me about between eight and fifteen times, I'd say, out that way."

Defendant was asked: "Have you been in a car when Mike Brown was present when cars were being driven by other boys when these curves were taken?" Plaintiff's objection having been overruled, defendant answered: "Yes, sir."

G.S. 8-51 in pertinent part provides: "Upon the trial of an action . . . a party . . . interested in the event . . . shall not be examined as a witness in his own behalf or interest . . . against the administrator . . . of a deceased person . . . concerning a personal transaction or communication between the witness and the deceased person . . . ; except where the . . . administrator . . .

is examined in his own behalf, or the testimony of the . . . deceased person is given in evidence concerning the same transaction or communication."

[2] Plaintiff-administratrix offered the testimony of Gray relating to what happened during the evening of Friday, 18 August 1972, from the time he, Brown and defendant got together until the wreck causing Brown's death. Thereby she rendered competent the testimony of Moore concerning the same transactions and communications. *Carswell v. Greene*, 253 N.C. 266, 116 S.E. 2d 801 (1960). Plaintiff interposed no objection to any of defendant's testimony concerning what happened when he, Gray and Brown were together during the evening of 18 August 1972. However, Gray's testimony concerning what happened during this period did not render competent testimony of defendant concerning what may have occurred between him and Brown on unrelated prior occasions. 1 Stansbury, North Carolina Evidence (Brandis Revision) § 75.

Plaintiff assigns as error the admission over her objection of testimony by defendant concerning transactions and communications between them on occasions prior to 18 August 1972. She contends this testimony, if relevant, was incompetent under G.S. 8-51 as construed in *Boyd v. Williams*, 207 N.C. 30, 175 S.E. 832 (1934), and *Stegall v. Sledge*, 247 N.C. 718, 102 S.E. 2d 115 (1958).

Plaintiff objected to the cross-examination of Gray by defendant's counsel concerning prior occasions when Brown had been a passenger in Moore's car. Although these objections were general, the evidence these questions sought to elicit was not within the issues raised by the pleadings. See G.S. 1A-1, Rule 15. Defendant's plea of contributory negligence contained no allegation to the effect that Moore was in the habit of taking the curves at maximum speed and that Brown knew it. Nor did the court treat defendant's pleading as having been amended to incorporate such an allegation. Under the court's instruction, contributory negligence in this respect was not submitted to the jury. In this connection, see *Roberts v. William N. and Kate B. Reynolds Mem. Park*, 281 N.C. 48, 187 S.E. 2d 721 (1972).

Over plaintiff's objection, Gray testified that he and Brown were in Moore's car "maybe twice" when Moore had taken the curves on Rotary Drive. Later, it was determined that Brown was not present on the only occasion Gray had attempted to identify.

Brown v. Moore

[3]   G.S. 8-51 did not disqualify Gray from giving testimony otherwise competent concerning transactions and communications between Brown and Moore in Gray's presence on prior occasions. Assuming Gray's testimony was sufficiently definite to have probative value and was otherwise properly admitted in evidence, it was permissible for defendant to testify only with reference to transactions and communications referred to in Gray's testimony. It was determined that Gray's testimony was incorrect—since Brown was not present—with reference to the one occasion identified by Gray. Gray's testimony that "maybe" there had been a different occasion when both Brown and Gray had been with Moore when Moore had taken the curves, without any suggestion as to the time, place or circumstances of such an occasion, was insufficient to identify any specific occasion to which testimony by defendant could relate.

The extensive testimony of defendant concerning rides by Brown with Moore practically every Saturday, including rides on county roads as well as on Rotary Drive, when Moore had taken the curves, did not relate to transactions and communications involved in Gray's testimony and was incompetent under G.S. 8-51. It related to occasions when Gray was not present, entirely different from any occasion referred to in Gray's testimony. The testimony did not purport to corroborate Gray. The ruling that it be treated as corroborative rather than substantive evidence added nothing to its competency.

Unquestionably, the admission of defendant's testimony, concerning numerous unidentified prior occasions when Brown was riding with him, seriously prejudiced plaintiff's case in that the thrust thereof was to cast Brown in the role of a willing participant in a dangerous venture in which the risks were known and voluntarily assumed by him. It seems probable and prejudicial impact of this erroneously admitted incompetent testimony played a material part in causing the jury to restrict plaintiff's recovery to the exact amount of the out-of-pocket expenses Brown's parents incurred on account of his death.

The court, in reviewing defendant's testimony, stated to the jury: "His [defendant's] testimony further tended to show that on previous occasions the deceased, Mike Brown, had ridden with the defendant on Rotary Drive, which is a curvy road, and also on a county road going to the defendant's brother-in-law's house, at which times the defendant had been driving his

car at a high rate of speed." We apprehend that this tended to emphasize the prejudicial impact of the incompetent evidence.

We hold that plaintiff is entitled to a new trial because of prejudicial error in the admission of incompetent evidence over her objections. Hence, the decision of the Court of Appeals is reversed. The case is remanded to that court with direction that it be remanded to the Superior Court of Guilford County for trial *de novo*.

Reversed and remanded.

Justices COPELAND and EXUM did not participate in the hearing or decision of this case.