OLIVETTI CORPORATION v. AMES BUSINESS SYSTEMS, INC.

No. 418PA86

(Filed 2 June 1987)

**1. Fraud § 12— material misrepresentations—reasonable reliance—sufficiency of evidence**

There was competent evidence before the trial judge from which he could find that plaintiff Olivetti made material misrepresentations to defendant, a dealer in Olivetti word processors, and that defendant reasonably relied on the misrepresentations where defendant's evidence tended to show that Olivetti falsely told defendant that an agreement between Olivetti and NBI, the manufacturer of an Olivetti word processor, contained a five-year software update provision, that the agreement was not in trouble, and that Olivetti would continue to support the word processor for five years; it was imperative that defendant be able to offer the long-term software update feature of the agreement to potential customers in order to sell the Olivetti equipment; in order to induce defendant to continue to purchase Olivetti word processors, Olivetti intentionally withheld information from defendant that Olivetti had breached its agreement with NBI and NBI was no longer manufacturing the Olivetti word processor or providing software updates and maintenance; defendant did not have access to the nature of the Olivetti-NBI relationship except as represented to it by Olivetti; and defendant continued to purchase word processors from Olivetti for resale but would not have done so if it' had known of the true status of the Olivetti-NBI agreement.

**2. Damages § 16.3— lost future profits—new business rule inapplicable in N. C.**

The "new business" rule, which precludes an award of damages for lost future profits where the allegedly damaged party has no recent record of profitability, is not the law in North Carolina. There should be no *per se* rule against the award of damages for lost future profits where they are shown with the requisite degree of certainty.

Olivetti Corp. v. Ames Business Systems, Inc.

**3. Damages § 16.3— lost profits—insufficient evidence**

The trial court erred in finding that defendant dealer lost an opportunity to make profits as an NBI dealer because of plaintiff Olivetti's misrepresentations concerning the nature and status of an agreement between Olivetti and NBI where there was no competent evidence before the court that defendant could have become an NBI dealership or that it was precluded from doing so by Olivetti.

**4. Damages § 16.3— lost profits—former employee's sales for another dealer—improper measure of damages**

The trial court erred in using a former employee's sales of NBI word processors for another dealer as a measure of damages for defendant's lost future profits from its failure to become an NBI dealer because of misrepresentations by plaintiff where there was insufficient evidence in the record to show that the former employee would have made the same sales with defendant that he did with the other dealer.

Justice FRYE concurring in part and dissenting in part.

ON discretionary review of the decision of the Court of Appeals, 81 N.C. App. 1, 344 S.E. 2d 82 (1986), affirming the judgment entered 7 January 1985 by *Ferrell, J.*, after hearings at the 14 May and 29 May 1984 Civil Non-jury Sessions of Superior Court, MECKLENBURG County. Heard in the Supreme Court 10 March 1987.

*Poyner & Spruill, by J. Phil Carlton and Mary Beth Forsyth, and Weinstein, Sturges, Odom, Groves, Bigger, Jonas & Campbell, by Hugh B. Campbell, Jr., for plaintiff-appellant.*

*Joe C. Young for defendant-appellee.*

*Lacy H. Thornburg, Attorney General, by John F. Maddrey, Assistant Attorney General, for the State, amicus curiae.*

MEYER, Justice.

In April 1978, defendant Ames Business Systems, Inc. (hereinafter "Ames"), was incorporated by James H. Nicholson, formerly a salesman of accounting machines for Olivetti Corporation, and Wade M. Perry, previously an owner and operator of a small company that sold business forms and supplies. Ames was initially capitalized by Nicholson and four other investors, including Perry's wife and mother-in-law, for $45,000; Perry did not contribute any capital to Ames. Ames was formed to sell word processors for plaintiff Olivetti Corporation (hereinafter "Olivetti").

Ames and Olivetti entered into an agreement to that effect on 3 March 1978, including a provision for Olivetti to provide long-term maintenance and service through its Charlotte office. Olivetti signed a service contract with Ames on 1 May 1978, and Ames executed an initial order of $85,000 worth of equipment on the same date. Olivetti closed its Charlotte office the following month, giving Ames the option of taking over the Olivetti sales operation. Ames agreed and began distributing word processors out of Charlotte. Olivetti assigned its service contract with Ames to Piedmont Business Systems, Inc. Until Ames opened up its own service department, service was performed by an employee of Piedmont, Rex Jones. Ames lost $13,400 during that first year.

In April 1979, Olivetti began preparing to market a new word processor, the Olivetti TES-701. This machine was to be manufactured by NBI, Inc. (hereinafter "NBI"), and was essentially identical to the NBI-3000. The TES-701 was to be sold for about thirty percent less than the NBI-3000 and was apparently to compete for the same market. On 10 April 1979, Olivetti entered into a contract with NBI (hereinafter the "NBI agreement"), which was renewable on an annual basis and provided that, in the event of nonrenewal, NBI would continue to provide parts to Olivetti for five years thereafter. There was no provision in the agreement for long-term software updates.[1] In the summer of 1979, Olivetti discussed with Ames the benefits of the TES-701. As a way of encouraging Ames to carry the TES-701, one of Olivetti's employees, Tom Gallagher, told Ames that the NBI agreement did in fact contain a long-term software update provision. In July 1979, Ames ordered one TES-701 as a demonstrator. Ames showed another loss that year of $24,400, leaving it with a net worth of about $7,000.

As early as February 1980, Olivetti began trying to get out of the NBI agreement. During the spring, Olivetti and NBI held talks to arrange an amicable separation. At the same time, Ames, unaware of these talks, continued to buy TES-701s from Olivetti and sell them. In July 1980, Olivetti breached the agreement with NBI. A termination agreement with NBI provided Olivetti with

---

1. There was considerable testimony at trial regarding the significance of long-term software updates. It was Ames' position, not disputed by Olivetti, that software updates are a critical feature in the salability of word processing equipment.

maintenance and software updates only through 31 December 1982. As part of the termination agreement, Olivetti and NBI agreed that the breakup would be kept secret. In the fall of 1980, Ames began to hear rumors, through Mr. J. S. Epley, a potential customer, that Olivetti and NBI might be breaking up. Olivetti's employee Gallagher reassured Ames that the agreement was still intact and that Geoffrey A. Kohart, also of Olivetti, would write to reassure Epley. Kohart wrote the letter on 26 November 1980. This letter alluded to the industry rumors, but tended to downplay the possibility of trouble between NBI and Olivetti. Apparently reassured by the letter, Ames bought several TES-701s from Olivetti and sold two to Epley. Olivetti sold these to Ames at a very low price, saying that it wanted to reduce its inventory. According to Ames, Olivetti represented that it wanted to reduce its inventory to make room for additional TES-701s from NBI. At the end of the year, Ames had a net worth of negative $31,800.

Early in 1981, Olivetti changed its credit terms with Ames. Before Olivetti would honor new orders for parts or equipment, Olivetti required Ames to sign trade acceptances for the amount that Olivetti claimed Ames still owed it, some $108,379.11. Ames did so under protest. In March 1981, Ames met with an NBI representative to discuss becoming a dealership. Audley W. Downs, a regional manager responsible for dealer operations for NBI, met with Perry; Julius M. "Jay" Ozment, Ames' sales manager; David Harrison, Ames' service representative; and another Ames employee for a full day. When Downs left, Perry decided that it would not be feasible to market the NBI-3000, since it was the same machine as the TES-701 and he would essentially be competing with himself. Downs apparently also decided that Ames was not ready to become an NBI dealership and did not recommend that such a dealership be offered at that time. According to Olivetti, Ames did not meet NBI's financial requirements for becoming a dealership—some $250,000. According to Ames, it decided not to pursue a dealership with NBI because it had been assured that Olivetti would continue to support the TES-701. Furthermore, Ames presented evidence that it needed only about $26,000 to become a dealership and that that amount was available to it.

In June 1981, NBI contracted with Information Processing Consultants (hereinafter referred to as "IPC") to become its

dealership in North Carolina. In August or September, during a training session in Georgia for the TES-351 (Olivetti's then-newest word processing system), Kohart, an employee of Olivetti, told Ozment that Olivetti was phasing out the TES-701. According to Ames, Olivetti told Ames in the summer of 1981 that it would be buying more TES-701s from NBI. Olivetti offered to sell Ames ten TES-701s at a considerable discount, claiming that it wanted to clear its inventory to make room for more TES-701s. At the time of the trial, Ames had been unable to sell seven of the machines. In the fall of 1981, Ozment left Ames and set up an office for IPC in Charlotte. At the end of the year, Ames had a net worth, according to Olivetti, of negative $78,000.

The trial court found that Olivetti had defrauded Ames and had committed unfair and deceptive trade practices in violation of N.C.G.S. § 75-1. It calculated Ames' damages for lost future profits to be $401,000 and for lost past profits to be $5,200 and trebled those amounts pursuant to N.C.G.S. § 75-1.1, awarding Ames $1,218,600. The court also found that Ames would have been entitled to substantial punitive damages from Olivetti if N.C.G.S. § 75-1 did not apply to this case. The trial court also found that Ames owed Olivetti $57,000 based upon a pre-existing debt. Finally, the trial court ordered Ames to return its unsold Olivetti word processors to Olivetti, the contract price of which was deducted from Ames' debt. The Court of Appeals affirmed the judgment in all respects.

[1]  Olivetti first argues that the Court of Appeals erred in affirming the trial court's finding that Olivetti made material misrepresentations upon which Ames reasonably relied. We disagree and affirm the Court of Appeals in this respect.

The trial court made extensive findings on this issue, including the following:

12. Based upon the false statements of Olivetti that it had a five year agreement with NBI for the 701, and the fact that the product was a good product, Ames purchased a demonstration 701 and proceeded to spend at least two-thirds of its time from August, 1979 through October, 1981 preparing to sell and attempting to sell the 701. In so doing, Ames concentrated its efforts on the 701 and slackened its efforts on

other products in its line. Ames did so in reliance upon the false representations of Olivetti.

. . . .

15. On or about July 17, 1980, Olivetti breached the NBI Agreement and refused to accept any further shipments of 701's from NBI. At that time Olivetti had over 400 of the 701's in inventory, at a purchase price of approximately $5,000 each, and was committed to purchase another 400 or more during the remainder of 1980. This breach was committed by Olivetti despite its representations to Ames that it had a five year supply agreement for the 701, and that it would support the 701 during that period of time.

. . . .

17. On or about September 23, 1980, Olivetti's president confirmed a termination arrangement reached September 15, 1980 with NBI's president. In this arrangement Olivetti would accept from NBI 47 additional 701 systems already completed, but no more; Olivetti would pay a $300 premium per unit on each of the 379 units purchased in 1980 ($113,700); NBI would make no additional software options available to Olivetti except records processing, stat/math, tailorable communications and a diablo wide track printer. The parties specifically agreed, at Olivetti's request, that no public announcement would be made about these matters. Olivetti never made a public announcement of the NBI termination.

. . . .

18. In October or November, 1980, Ames heard, through a potential customer, a rumor that Olivetti had breached the NBI Agreement and that the Agreement had been terminated. The customer, Mr. J. S. Epley of Charlotte, was considering the purchase of a 701 from Ames, and had heard about these matters. Mr. Epley was disturbed, because he liked Ames and the 701 but did not want to purchase a 701 unless he could be assured of continued service, and support, including hardware and software updates. He conveyed the information and his concern to Ames; and Mr. Jay Ozment,

Ames' salesman, telephoned Olivetti from Charlotte to check on the rumors.

. . . .

19. Mr. Ozment first talked about the matter with Mr. Gallagher, at Olivetti, the former product manager for the 701. Mr. Gallagher told Mr. Ozment there was no truth to the rumor and that everything was fine between NBI and Olivetti. Mr. Gallagher again stated that the Agreement with NBI was for five years, and said Olivetti was merely negotiating with NBI over price and systems updates. He then referred Mr. Ozment to Mr. Geoffrey Kohart, the then-current Olivetti product manager for the 701. Mr. Kohart confirmed to Mr. Ozment that the rumors were false, and that Olivetti and NBI were merely negotiating over quantities to be shipped. Mr. Kohart agreed to write Mr. Epley a letter confirming these matters.

. . . .

20. On or about November 26, 1980, Mr. Kohart, on behalf of Olivetti, wrote a letter to Mr. Epley in which he failed to acknowledge that the parties had agreed not to renew the NBI Agreement for 1981, and falsely stated that the Agreement provided for software disks, supplies and technical support for five years. Mr. Kohart wrote a similar letter to another dealer, in Minneapolis, in which he also falsely stated that the NBI Agreement provided for systems software updates for five years after its termination.

. . . .

25. In the summer of 1981 Olivetti offered to sell Ames 10 of the 701's on credit, at a substantially discounted price of $5,600.00 each. Ames asked Olivetti why it was selling the products at such a low price, and Olivetti falsely told Ames it was trying to reduce its inventory so it could purchase more 701's from NBI pursuant to its contract with NBI. Olivetti never told Ames that the NBI Agreement had been breached by Olivetti or that it had been terminated by NBI. Based upon Olivetti's misrepresentations, Ames purchased, on credit, 10 of the 701's from Olivetti in the early fall of 1981, plus two Olivetti 351's, a new word processing machine.

Ames would not have purchased any of these machines if it had been told the truth by Olivetti. The total purchase price for the machines was $62,348. Ames signed notes or trade acceptances for the two 351's in the amount of $6,348 on August 28, 1981 and for the ten 701's in the amount of $56,000 on November 11, 1981.

(Document numbers and exhibit numbers omitted.)

In a non-jury trial, the trial court's findings of fact are conclusive on appeal if supported by competent evidence. *Goldman v. Parkland of Dallas, Inc.*, 277 N.C. 223, 176 S.E. 2d 784 (1970). Our task, therefore, is limited to determining whether there was competent evidence before the judge from which he could find that Olivetti made material misrepresentations to Ames and from which he could find that Ames reasonably relied on those misrepresentations.

The trial judge heard testimony from Perry and Ozment regarding statements made by Gallagher that the NBI agreement contained a five-year software support provision, that the agreement between NBI and Olivetti was not in trouble, and that Olivetti would continue to support the TES-701 for five years. Moreover, the court had before it the 26 November 1980 letter from Kohart to Epley and the testimony of Perry that he understood the letter to be an assurance that the NBI-Olivetti agreement was not about to be breached. Finally, there was the testimony of Perry that he was further reassured in 1981 by officers of Olivetti that the agreement was intact.

There was also evidence that the representations made to Ames regarding the NBI agreement were false. The NBI agreement did not contain a provision for five years of software support. Olivetti concedes that the letter from Kohart was "technically incorrect" in that it represented that the NBI agreement included such support. Moreover, at the time this letter was written, NBI and Olivetti were trying to arrange a termination agreement. There was evidence from Ozment and Perry that Olivetti later withheld information from Ames regarding the actual breach of the NBI agreement. In fact, Olivetti's representations to Ames in 1981 came over a year after the NBI agreement had been breached. It appears, then, that there was competent evidence to support the trial court's finding that Olivetti made

misrepresentations to Ames regarding the nature and status of the agreement between Olivetti and NBI.

The trial court also found that the misrepresentations were material. Perry and Ozment testified to the significance of the agreement between NBI and Olivetti. Of paramount concern was the long-term support feature of the agreement. According to both witnesses, it was imperative that Ames be able to offer such support to potential customers in order to sell the Olivetti equipment. Moreover, Perry testified that he would not have bought more TES-701s if he had known of the true status of the NBI agreement. There was therefore evidence to support the judge's finding that the misrepresentations about the NBI agreement were material. This finding was also supported by evidence of Olivetti's attempts to keep the information about the breach secret. We hold, therefore, that there was sufficient evidence to support the trial judge's findings that Olivetti's misrepresentations were material.

Olivetti argues, however, that even if there were material misrepresentations, Ames was not reasonable in relying upon them. Olivetti cites *Calloway v. Wyatt*, 246 N.C. 129, 97 S.E. 2d 881 (1957), for the proposition that Ames had a duty of diligence to look beyond assurances made to it.

*Calloway* concerned a land transaction. The plaintiff-buyer knew that there were water shortages in the area and was concerned that the well on the property might not provide enough water to supply the house. The defendant-seller said that there was "plenty of" water in the well. The buyer did not turn on the water spigot until after the sale was closed. In holding that the plaintiff had not reasonably relied on the sellers' representations, we said:

> " 'It is generally held that one has no right to rely on representations as to the condition, quality or character of property, or its adaptability to certain uses, where the parties stand on an equal footing and have equal means of knowing the truth. The contrary is true, however, where the parties have not equal knowledge and he to whom the representation is made has no opportunity to examine the property or by fraud is prevented from making an examination.' 12 R.C.L., 384 [23 Am. Jur. *Fraud and Deceit* § 169 (1939)].

> When the parties deal at arms length and the purchaser has
> full opportunity to make inquiry but neglects to do so and
> the seller resorted to no artifice which was reasonably
> calculated to induce the purchaser to forego investigation ac-
> tion in deceit will not lie. *Cash Register Co. v. Townsend*, 137
> N.C. 652; *May v. Loomis*, 140 N.C. 350; *Frey v. Lumber Co.*,
> 144 N.C. 759; *Tarault v. Seip*, 158 N.C. 359, 23 A.J., 981."

*Calloway*, 246 N.C. at 134, 97 S.E. 2d at 885-86 (quoting *Harding v. Insurance Co.*, 218 N.C. 129, 134, 10 S.E. 2d 599, 602 (1940)).

Our decision, then, rested on three factors which are not present in the case at bar. First, in *Calloway* the plaintiff could have found out simply by turning on the faucet whether there was water in the house. We specifically held that the case would have been different if the buyer and seller had not had equal access to the information concerning presence or absence of adequate water for the house. Second, we noted that there was no allegation or proof by the plaintiff that the defendant had intended to deceive the plaintiff or even that the defendant was aware that there was insufficient available water. Third, *Calloway* rested on the established principle that representations about the quality or usability of real property are not ordinarily the subject of fraud. Under the unique facts of that case, we held that the plaintiff was under a duty to make the minimal inquiry needed to find out the truth.

Olivetti nonetheless relies on *Calloway* and argues that Ames should not have relied on the assurances of Gallagher and Kohart. Specifically, Olivetti contends that Perry should have made further inquiries of Kohart after reading the letter to Epley. Olivetti argues that Ames was put on notice, by rumors in the trade, that trouble was brewing between Olivetti and NBI and that Ames' reliance upon Kohart's letter was unreasonable as a matter of law. Moreover, Olivetti points to testimony of Rex Jones, an employee of Piedmont Business Equipment and previously Olivetti's service manager. Jones testified that he and Ozment had discussed, in the summer of 1981, the rumored breach of the NBI agreement. Thus, according to Olivetti, Ames was not reasonable in relying on any contrary representations from Olivetti after the summer of 1981. We disagree.

Ordinarily, the question of whether an actor is reasonable in relying on the representations of another is a matter for the finder of fact. *Whitaker v. Wood,* 258 N.C. 524, 128 S.E. 2d 753 (1963). While there are some extreme circumstances in which conduct may be considered unreasonable as a matter of law, this is not such a case. *Calloway,* a case where the two parties had equal access to the truth and where there was no evidence of intentional misrepresentation, does not apply. There was competent evidence here that Ames did not have access to the nature of the NBI-Olivetti relationship except as fraudulently represented to it by Olivetti. Olivetti's reliance upon some evidence that Ames was informed from other sources of the NBI-Olivetti breakup is misplaced. Such conflicts and contradictions in the evidence are for the trier of fact to resolve. *Garrett v. Garrett,* 229 N.C. 290, 49 S.E. 2d 643 (1948). In light of the evidence that Olivetti intentionally misled Ames for the purpose of inducing Ames to continue to deal with Olivetti and in light of the evidence that Olivetti intentionally withheld information regarding the breach of the NBI agreement, Olivetti will not now be heard to complain that Ames believed its false representations. We hold, therefore, that there was competent evidence from which the trial judge could find that Olivetti made material misrepresentations to Ames, upon which Ames reasonably relied.

Olivetti next argues that the trial court erred in finding that Ames was damaged by Olivetti's misrepresentations. We agree and reverse the Court of Appeals to the extent that it affirmed the trial court's award of damages.

The trial court found as facts that had it not been for Olivetti's fraud, Ames could have become an NBI dealer; that if Ames had become an NBI dealer, Ozment would not have left Ames to join IPC; and that if Ozment had stayed with Ames, he would have made the same sales for Ames as he did for IPC. The court concluded that the proper measure of damages was the sales Ozment made for IPC during the three years after Ozment left Ames.[2] Olivetti argues that Ames should be precluded from

2. The trial court also found that Ames was damaged by having, subsequent to the filing of this action, sold two TES-701s at a loss of $5,200. The proper measure of damages for fraudulent misrepresentation in the sales context is the difference between the goods as represented and their actual value at the time and place of acceptance. N.C.G.S. §§ 25-2-721, 25-2-714 (1986). Because Ames did not present the

recovering any damages for lost profits because Ames had not previously made any profits. Alternatively, Olivetti argues that even if Ames is not barred as a matter of law from showing lost future profit damages, it has not done so here with the reasonable certainty our law requires.

[2] We first consider Olivetti's argument that the "new business" rule should be applied to this case. This rule would preclude an award of damages for lost profits where the allegedly damaged party has no recent record of profitability. *See* Comment, *Remedies—Lost Profits as Contract Damages for an Unestablished Business: The New Business Rule Becomes Outdated*, 56 N.C.L. Rev. 693 (1978).[3] Jurisdictions applying this rule seem to have decided, as a matter of law, that a showing of lost future profit damages by such a business will be too speculative. Moreover, the new business rule is founded in part on the contract law principle that only those damages within the contemplation of the parties at the time of contracting are recoverable. *See* E. Hightower, *North Carolina Law of Damages* § 2-8 (1981). Where the action is in tort rather than contract, the principle is stated somewhat differently, to the effect that the damages must be the natural and probable result of the tort-feasor's misconduct. *Steffan v. Meiselman*, 223 N.C. 154, 25 S.E. 2d 626 (1943). Olivetti argues that where a new business is involved, the parties would not contemplate lost profits as an element of either contract or tort damages.

[3] Olivetti has directed our attention to several cases from other jurisdictions applying the new business rule. *See, e.g., E.F.K. Collins Corp. v. S.M.M.G., Inc.*, 464 So. 2d 214 (Fla. App.

---

trial court with evidence of the difference in value between the TES-701s as represented and their actual value at the time of their acceptance, however, it appears that there was nothing before the court upon which to base its finding in this regard. We therefore vacate that part of the trial court's finding that awards Ames $5,200 for lost past profits from the sale of two TES-701s.

3. We note in passing that the term "new business" for the purposes of this doctrine is not restricted to those businesses that have recently been instituted, but rather applies to any business without a recent history of profitability. Thus Ames' argument that the new business rule does not apply to it because it is not "new" need not be considered. Since the record is clear that Ames never had a profitable year, the new business rule would apply to Ames should this Court adopt that rule.

1985); *Radlo of Georgia, Inc. v. Little*, 129 Ga. App. 530, 199 S.E. 2d 835 (1973); *Buddy's Tastee #1, Inc. v. Tastee Donuts, Inc.*, 483 So. 2d 1321 (La. App.), *writ denied*, 486 So. 2d 738 (La. 1986); *Kenford Co., Inc. v. County of Erie*, 67 N.Y. 2d 257, 502 N.Y.S. 2d 131 (1986); *First Texas Savings Association of Dallas v. Dicker Center, Inc.*, 631 S.W. 2d 179 (Tex. App. 1982). It appears, however, that this Court has never addressed the question of whether the new business rule is the law in North Carolina. Olivetti urges us to adopt this rule, arguing that it guards against windfall recoveries to aggrieved parties based upon speculative forecasts of hypothetical losses. Olivetti cites *Lawrence v. Stroupe*, 263 N.C. 618, 139 S.E. 2d 885 (1965), for the proposition that we have always viewed future damages claims with strict scrutiny and concludes that the new business rule is in keeping with our rejection of speculative damage awards and our close review of awards of future damages.

While we agree with Olivetti that lost future profits are difficult for a new business to calculate and prove, we are persuaded that there should be no *per se* rule against the award of such damages where they may be shown with the requisite degree of certainty. Accordingly, we hold, along with what appears to be a majority of jurisdictions reaching the issue, that the new business rule is not the law of our state.

It is a well-established principle of law that proof of damages must be made with reasonable certainty. *Weyerhaeuser v. Supply Co., Inc.*, 292 N.C. 557, 234 S.E. 2d 605 (1977). Olivetti argues that Ames has not proven with reasonable certainty either that it lost the opportunity to become an NBI dealership or what, if any, profits it would have made as an NBI dealership. We agree.

In order for Ames to show that it was deprived of an opportunity to make profits, it must first show that there was in fact such an opportunity. The trial judge found as a fact that Ames, in reliance on Olivetti's misrepresentations, passed up the opportunity to become an NBI dealer. We hold, however, that there was no competent evidence to support this finding. There was no evidence that NBI ever offered a dealership to Ames. On the contrary, the testimony from Downs, the NBI representative, was that no such offer was made. Although a firm offer is not a prerequisite for recovery under a lost opportunity theory, *Rannbury-*

*Kobee Corp. v. Miller Machine Co., Inc.,* 49 N.C. App. 413, 271 S.E. 2d 554 (1980), Downs also testified that Ames did not appear to qualify financially for such an undertaking. Perry, Ozment, and Harrison, all employees or former employees of Ames, testified that after the meeting with Downs, Ames decided not to pursue becoming an NBI dealership. While these witnesses were competent to testify to their own intentions, they were not competent to testify that NBI would ever have made a dealership offer to Ames. There was, therefore, no competent evidence before the judge to support his finding that Ames could have become an NBI dealership.

Ames' proof was insufficient in another respect. Ames contends that it passed up the opportunity to become an NBI dealership in order to remain an Olivetti dealer. However, there was no evidence at trial that Ames could not have been both an NBI dealer and an Olivetti dealer. In fact, Ames did take on other lines of equipment while remaining a dealer for Olivetti. Moreover, Jay Ozment was able to sell both NBI and Olivetti equipment for IPC. Thus, even if Ames was defrauded into retaining the Olivetti line of equipment, it was not precluded from taking on the NBI line. We hold that there was insufficient evidence to support the trial court's finding that Ames could have become an NBI dealership in 1981 or that, if it could have become an NBI dealership, it was precluded from doing so by Olivetti. We hold, therefore, that Ames has failed to show with reasonable certainty that it lost an opportunity to make profits as an NBI dealer.

[4] Even if Ames had shown that it could have become an NBI dealer, it has not shown with reasonable certainty that it would have made profits in that event. The trial court used as a measure of Ames' lost profits the sales of Jay Ozment for IPC, the company that became the NBI dealership in North Carolina. The court concluded that Ozment would not have left Ames if Ames had become an NBI dealer and that Ozment would have made the same sales for Ames as he did for IPC.

The burden of proving damages is on the party seeking them. *Brown v. Moore,* 286 N.C. 664, 213 S.E. 2d 342 (1975). As part of its burden, the party seeking damages must show that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable

certainty. *Midgett v. Highway Commission*, 265 N.C. 373, 144 S.E. 2d 121 (1965).

In finding of fact 27, the trial court recited:

27. If Ames had become an NBI dealer in late 1980 or early 1981, it is reasonable that Jay Ozment would not have left Ames and also David Harrison, and that Ames would have had the sales which Jay Ozment produced for IPC, and also the service business which Ames lost to IPC. Also, it is reasonable that Ames would have gotten the normal amount of service business from the additional sales.

We note first that while the trial judge denoted this as a finding of fact, we are not bound by this designation. *Brown v. Board of Education*, 269 N.C. 667, 153 S.E. 2d 335 (1967). It appears to us that this finding includes a mixed question of fact and law. While the amount of damages is ordinarily a question of fact, the proper standard with which to measure those damages is a question of law. *See Weyerhaeuser Co. v. Supply Co.*, 292 N.C. 557, 234 S.E. 2d 605 (jury award of damages for breach of contract vacated because measure of damages incorrect). Such questions are, therefore, fully reviewable by this Court. *Taylor v. Cone Mills*, 306 N.C. 314, 293 S.E. 2d 189 (1982).

We have previously held that there was insufficient evidence to support the trial court's finding that Ames would have become an NBI dealer had it not been for the misrepresentations of Olivetti. The trial court's conclusion in finding 27 that Ozment would have made the same sales for Ames as he did for IPC was based upon the false premise that Ames did not become an NBI dealer because of Olivetti's misconduct and is erroneous as a matter of law. Assuming, *arguendo*, that the trial court was not precluded from using Ozment's sales for IPC as a measure of Ames' damages, there was insufficient evidence before the trial court to measure such damages with reasonable certainty. There is little evidence in the record on the question of whether Ozment would have made the same sales with Ames that he did with IPC. The evidence that is in the record suggests that IPC was able to market its products more widely and sell those products more cheaply than could Ames, regardless of any misconduct by Olivetti. Ames' only evidence on this question was that Ozment used similar sales techniques for IPC that he had for Ames and, though

later his sales territory was considerably larger, that for some time he sold only in the Charlotte area. The judge's conclusion from this evidence that Ozment would have made any sales for Ames over the next three years, much less that he would have made more than $800,000 worth of sales, was manifestly unsupported and the result of speculation. We hold that the trial court erred in using Ozment's sales as a proper measure of damages. Accordingly, the trial court's award of damages to Ames must be vacated.

Olivetti next argues that the trial court erred in trebling the damage award pursuant to Chapter 75 of our General Statutes. Because we have held that Ames did not prove its damages with reasonable certainty, we need not address this question. Nor do we reach Ames' contention that it is entitled to punitive damages if we were to determine that Chapter 75 does not apply to this case. Punitive damages may only be awarded where some compensatory damages have been shown with reasonable certainty. *Oestreicher v. American National Stores*, 290 N.C. 118, 225 S.E. 2d 797 (1976).

The final issue raised by Olivetti concerns the amount due it from Ames from past purchases of equipment. Olivetti argues that the trial court improperly reduced its claim of $148,990.68. As evidence of Ames' debt, Olivetti introduced certain trade acceptances signed by Ames. The trial court found that these trade acceptances were signed under protest and recalculated the actual amount owed Olivetti. He then ordered unsold Olivetti equipment to be returned by Ames and reduced the amount of the debt accordingly. We find no error in the judge's determination of the amount owed Olivetti by Ames and therefore affirm the Court of Appeals in this regard.

In sum, we hold that the trial court correctly concluded that Olivetti made material misrepresentations to Ames, upon which Ames reasonably relied. However, Ames has not borne its burden of showing that it was damaged by these material misrepresentations. We conclude further that Ames is not entitled to punitive damages, as it has not shown any compensatory damage. We find no error in the trial court's calculation of the amount due Olivetti by Ames. We need not reach the question of whether Chapter 75 applies to this transaction.

Affirmed in part, reversed in part.

Justice FRYE concurring in part and dissenting in part.

I concur in that part of the majority's opinion which affirms the trial court's findings that Olivetti intentionally made material misrepresentations upon which Ames reasonably relied, and that portion which rejects the so-called "new business rule." I dissent from that portion of the opinion which holds that the trial court erred in finding that Ames was damaged by Olivetti's misrepresentations.

First, I dissent from that portion of the majority opinion (tucked away in footnote number 2) vacating the findings by the trial court which support the $5,200 award to Ames for losses from the sale of two TES-701s. Because Olivetti failed to properly present and discuss the trial court's award of $5,200 for Ames' loss from the sale of two TES-701s, this issue is deemed to have been abandoned and therefore is not properly before this Court. *See* N.C.R. App. P. 28(a) and 16(a).

Rule 28(a) of the North Carolina Rules of Appellate Procedure deals expressly with situations where parties make assignments of error on appeal but do not present or discuss the alleged errors in their brief. The rule plainly states that:

[q]uestions raised by assignments of error in appeals from trial tribunals but not then presented and discussed in a party's brief, are deemed abandoned.

N.C.R. App. P. 28(a).

On appeal to the Court of Appeals, Olivetti, by assignment of error number 10 based on exception numbers 32 and 33 raised the question regarding the trial court's award of $5,200 to Ames for losses resulting from the sale of two TES-701s purchased from Olivetti. However, Olivetti failed to present or discuss this question in its brief before the Court of Appeals. Indeed the Court of Appeals acknowledges this omission in its opinion, noting that "Olivetti contests only that part awarded for *lost profits*." (Emphasis added.) *Olivetti Corp. v. Ames Business Systems, Inc.*, 81 N.C. App. 1, 15, 344 S.E. 2d 82, 90 (1986). Therefore, pursuant to Rule 28(a), the question concerning the basis for the trial court's award of damages to Ames for losses on the sale of two TES-701s,

raised in Olivetti's assignment of error number 10, was properly deemed abandoned.

Rule 16(a) of the North Carolina Rules of Appellate Procedure defines the scope of this Court's review of the Court of Appeals' decision, in pertinent part, as follows:

> Review by the Supreme Court after a determination by the Court of Appeals . . . is to determine whether there is error of law in the decision of the Court of Appeals. Except where the appeal is based solely upon the existence of a dissent in the Court of Appeals, review is limited to consideration of the questions properly presented in the new briefs required by Rules 14(d)(1) and 15(g)(2) to be filed in the Supreme Court . . . . A party who was an appellant in the Court of Appeals, and is either an appellant or an appellee in the Supreme Court, may present in his brief any question which he properly presented for review to the Court of Appeals . . . .

This case comes to us on discretionary review of the Court of Appeals' decision. In its new brief, Olivetti, however, again does not contest the trial court's award of $5,200 to Ames for losses resulting from the sale of two TES-701s. Thus, Olivetti has failed to bring a challenge to this award within the scope of our review as required by Rule 16(a). Moreover, under Rule 16, Olivetti, the appellant in the Court of Appeals, having failed to properly present this issue in the Court of Appeals, could not have raised the issue anew in its brief on appeal to this Court. *See* N.C.R. App. P. 16(a).

Furthermore, even if the question of whether the trial court's findings support the $5,200 award to Ames for losses from the sale of the two TES-701s were properly before this Court, I could not agree with the majority's decision to vacate these findings. Assuming that the majority is correct in stating that the "proper measure of damages for fraudulent misrepresentation in the sales context is the difference between the goods as represented and their actual value at the time and place of acceptance," I disagree with the majority's conclusion that "it appears that there was nothing before the court upon which to base its findings" that Ames lost $5,200 from the sale of the two TES-701s.

Defendant's answer to plaintiff's interrogatories reveals that Ames purchased ten TES-701s from Olivetti, priced at $5,600

each; Ames in turn sold two of the units for a total of $6,000, thus resulting in a loss of $5,200 on the sale of these two units. The contract price at which Ames purchased the TES-701s is regarded as strong evidence of the value of the goods as represented, *see HPS, Inc. v. All Wood Turning Corp.*, 21 N.C. App. 321, 204 S.E. 2d 188 (1974), and the price received for the two TES-701s sold by Ames in an arm's-length transaction is some evidence of their value at the time of acceptance. *Credit Co. v. Concrete*, 31 N.C. App. 450, 229 S.E. 2d 814 (1976). Thus there is competent evidence supporting the trial court's findings and award based on Ames' $5,200 loss from the sale of the two TES-701s.

Second, I dissent from that portion of the majority opinion which holds that Ames failed to show that it was damaged by Olivetti's misrepresentations. The majority in its opinion rightly declines to adopt the so-called "new business rule" as the law in North Carolina as a special exception to our existing rules regarding proof of damages. It correctly states that the proper test to apply in the instant case is whether proof of damages has been shown with reasonable certainty. It then incorrectly concludes that Ames failed to do so.

As our Court of Appeals observed, it appears to be a general rule that where the *fact* of damages is proven with reasonable certainty, most courts allow plaintiffs some latitude in proving the *amount* of damages in actions involving wrongful conduct such as tort and antitrust actions. *See*, e.g., D. Dobbs, *Remedies*, § 3.3 at 151, 153-55 (1973). As the United States Supreme Court has said,

> Where the [wrongful conduct] itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

*Story Parchment Co. v. Patterson Parchment Co.,* 282 U.S. 555, 563, 75 L.Ed. 544, 548 (1931). In another case, it elaborated:

> Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery.

> The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created . . . . That principle is an ancient one, *Amory v. Delamirie,* 1 Strange 505, 93 Eng. Reprint 664, and is not restricted to proof of damage in antitrust suits, although their character is such as frequently to call for its application.

*Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264-65, 90 L.Ed. 652, 660 (1946) (holding, *inter alia,* that profits of a rival theater were sufficient to prove lost profits in an antitrust action) (citations omitted).

In the instant case, Ames clearly proved the *fact* of damages. The trial court found as follows on this question:

> 31. Olivetti's conduct in November, 1980, whereby it intentionally misled Ames by falsely telling Ames that its relationship with NBI was all right, and that it was negotiating with NBI for a continuation of the NBI Agreement, and that the Agreement provided for certain support for five years, when, in fact, Olivetti had breached its agreement with NBI and the two companies had agreed not to renew the NBI Agreement, and the Agreement did not provide for the support represented by Olivetti, constituted willful and intentional fraud and unfair and deceptive business acts and practices by Olivetti against Ames. Olivetti's representations were made to Ames in order to conceal Olivetti's earlier misrepresentations to Ames and to further deceive Ames and to induce Ames to continue its efforts to market the 701 product; and they did in fact deceive Ames. Ames reasonably relied upon these intentional misrepresentations, to its detri-

ment, in that it continued to expend efforts to market the 701, and borrowed $46,000 to purchase for cash five additional 701's which it continued to market, and thereby passed up other business opportunities, including an opportunity to become an NBI dealer in early 1981.

The Court finds that Ames' damages for this continued fraud and unfair and deceptive business acts or practices, are $401,000.00. This figure includes $77,000 in lost profits in 1982, $121,000 in lost profits in 1983, and $203,000 in lost profits in 1984.

As the majority so correctly notes, in a non-jury trial the trial court's findings of fact are conclusive on appeal if they are supported by any competent evidence. *Huski-Bilt, Inc. v. Trust Co.*, 271 N.C. 662, 157 S.E. 2d 352 (1967). This is true despite the fact that the evidence may be conflicting. *Id.* Both credibility and weight are matters for the finder of fact, not for the appellate courts. *Plott v. Plott*, 313 N.C. 63, 326 S.E. 2d 863 (1985); *Harrington v. Rice*, 245 N.C. 640, 97 S.E. 2d 239 (1957).

In the instant case, the trial judge's finding that Ames was damaged, that is, the *fact* of damages, is supported by other findings of fact and by ample competent evidence.

The majority appears to be much swayed by Olivetti's attempt to depict Ames as an incorrigible loser that could not in any event have made a profit, and it places great stress upon the fact that Ames never in fact showed a profit. The evidence does not support Olivetti's characterization. Ames was formed in 1978 primarily to market Olivetti products. Perry, its president, testified that the company projected a loss for its first two years of operation, due largely to its start-up expenses. It did in fact lose $13,400 in its first year on sales of $133,903. It lost $24,445 its second year on sales of $238,984. However, there was evidence that during this second year (1979) Ames spent $40,000 promoting the TES-701s, although it did not yet have any to sell. One need not stretch the facts to conclude that without this additional expenditure, Ames would have made a profit in 1979, one year ahead of its projections.

Ames' loss in 1980 may be similarly attributed to its efforts on behalf of Olivetti's TES-701. In 1980, Ames had a total loss of

$38,421. The trial court found that beginning in August 1979, through October 1981, at least two-thirds of Ames' time was spent preparing to sell and attempting to sell the 701. This finding is supported by ample evidence. The court also found that Ames slackened its efforts on its other products. This finding is supported both by testimony and by documentary evidence; Ames sold eighteen Olivetti 401s, one of its main products before the TES-701, in 1979, but only seven of these machines in 1980. Ames' total sales in 1980 fell to $193,417. Of this amount, $88,745 represents sales of the TES-701s, giving the company a gross profit on these sales of only $38,577.60. Ames spent $83,000 in this year promoting the machine. Therefore had Ames not been trying to market the TES-701, it might also have made a profit in 1980. Thus, there is simply no basis for concluding, as Olivetti would have the Court do, that Ames was inherently a losing proposition.

Similarly, Ames presented ample evidence that had Olivetti not reneged on its various commitments regarding the TES-701, Ames would have made profits marketing that machine. Perry testified that Ames did not actually begin presenting demonstrations on the TES-701 or have any models that it could sell until the beginning of 1980. Olivetti sent it a demonstrator model in October of 1979, but the model did not work. Ames was forced to wait for replacement parts. Ozment, Ames' principal salesman, testified that initial sales of the TES-701 were good. Then, as the trial court found,

18. In October or November, 1980, Ames heard, through a potential customer, a rumor that Olivetti had breached the NBI Agreement and that the Agreement had been terminated. The customer, Mr. J. S. Epley of Charlotte, was considering the purchase of a 701 from Ames, and had heard about these matters. Mr. Epley was disturbed, because he liked Ames and the 701 but did not want to purchase a 701 unless he could be assured of continued service, and support, including hardware and software updates. He conveyed the information and his concern to Ames; and Mr. Jay Ozment, Ames' salesman, telephoned Olivetti from Charlotte to check on the rumors.

19. Mr. Ozment first talked about the matter with Mr. Gallagher, at Olivetti, the former product manager for the

701. Mr. Gallagher told Mr. Ozment there was no truth to the rumor and that everything was fine between NBI and Olivetti. Mr. Gallagher again stated that the Agreement with NBI was for five years, and said Olivetti was merely negotiating with NBI over price and systems updates. He then referred Mr. Ozment to Mr. Geoffrey Kohart, the then-current Olivetti product manager for the 701. Mr. Kohart confirmed to Mr. Ozment that the rumors were false, and that Olivetti and NBI were merely negotiating over quantities to be shipped. Mr. Kohart agreed to write Mr. Epley a letter confirming these matters.

These findings are in accord with both Perry's and Ozment's testimony. The trial court went on to find that Mr. Kohart did write the requested letter, which was introduced into evidence, and that Mr. Epley did then purchase two TES-701s, which purchase is again supported by the evidence.

Nevertheless, the rumors continued and played havoc with Ames' attempts to sell the TES-701. The trial court found:

21. As a result of the rumors in the trade that NBI had terminated the Agreement [which would render it impossible for Olivetti to properly support the TES-701], it became very difficult for Ames to sell the 701 product in 1981. Ames representatives conferred on several occasions during 1981 with Olivetti representatives, but Ames was never told of the termination of the NBI Agreement. Olivetti kept this information from Ames and its other dealers, and misrepresented the fact that the Agreement had been terminated in order to be able to sell its inventory of 701's to them.

. . . .

23. Although Ames eventually sold the five 701's it purchased from Olivetti in December, 1980, these sales were very slow and difficult because of Olivetti's secret actions, even with reduced prices and high trade-ins, and Ames lost sales and profits as a result of Olivetti's actions.

Both Perry and Ozment testified that the persistent rumors that Olivetti would not continue to provide support for the TES-701 was what made it difficult to market. The trial court found that "customers and dealers are very reluctant to purchase a product

like the 701 if they cannot be fairly assured of continued hardware and software updates and support," and again, this finding is amply supported by testimony.

Thus, Ames clearly showed, and the trial court so found, that Olivetti's actions made it difficult for Ames to sell the TES-701 because of customer fears of losing a source of support for the machine. Ames also showed through its evidence, again reflected in the trial court's findings, that the opposite result was likely when support was available.

The trial court found that in the summer of 1981, Olivetti sold Ames ten TES-701s at a cheaper price than usual, falsely assuring Ames that the low price was to reduce its inventory so that it could purchase more of them from NBI. As the majority correctly notes, this finding was supported by competent evidence. The trial court also found:

> 26. At or about the time Olivetti sold the ten 701's to Ames, it also sold approximately 100 of these products to a consortium of NBI dealers, including one dealer in North Carolina. Olivetti did not inform Ames about this sale. When Ames' salesman, Jay Ozment, learned about the sale by Olivetti of the 701's to NBI dealers, including one dealer in Raleigh, he, his wife Teresa, who was Ames' Marketing Service Representative, and Ames' serviceman, David Harrison, concluded that Olivetti had destroyed the market for the 701 for Ames, and in so doing had destroyed Ames, and they proceeded to make plans to leave Ames. Mrs. Ozment left Ames in October, 1981. Mr. Ozment and Mr. Harrison left Ames in late October or early November, 1981, and went to work for the new North Carolina dealer for NBI products, a company called IPC. Mr. Ozment and Mr. Harrison opened a Charlotte office for IPC and proceeded to take a substantial amount of Ames' service business from Ames and to successfully sell Olivetti 701's and NBI 3000's in the Charlotte area.

> Mr. Ozment sold nine Olivetti 701's during his first eleven months with IPC, at a price of $9,995 each, plus related accessories, totalling $130,000 in sales of Olivetti equipment. In addition, he sold NBI products similar to the Olivetti products. In his last complete fiscal year with IPC, October, 1982 through September, 1983, Mr. Ozment, using

sales practices similar to those he used with Ames, sold $413,000 of NBI products. From the end of September, 1983 until the date of his testimony (May 15, 1984), he had sold $282,000 of NBI products. The gross profit of these products is approximately 35 percent.

This finding is supported by Ozment's testimony.

Ozment stated flatly that the reason he could sell TES-701s at IPC and not at Ames was that IPC, being itself an NBI dealer, could provide assurances of support for the machine. Ozment also experienced no difficulties in selling NBI's own product, the 3000, as a salesman for IPC. As Olivetti's own attorney acknowledged before the trial court, the NBI 3000 and the TES-701 were essentially identical machines, having only "minor cosmetic differences."

Thus, the evidence appears to amply support the *fact* that Ames lost sales and profits because of Olivetti's clandestine behavior.

The majority asserts that Ames has failed to show with reasonable certainty the *amount* of lost profits. It says:

Assuming, *arguendo* that the trial court was not precluded from using Ozment's sales for IPC as a measure of Ames' damages, there was insufficient evidence before the trial court to measure such damages with reasonable certainty. There is little evidence in the record on the question of whether Ozment would have made the same sales with Ames that he did with IPC. The evidence that is in the record suggests that IPC was able to market its products more widely and sell these products more cheaply than could Ames, regardless of any misconduct by Olivetti. Ames' only evidence on this question was that Ozment used similar sales techniques for IPC that he had for Ames and that for some time he sold only in the Charlotte area. The judge's conclusion from this evidence that Ozment would have made any sales for Ames over the next three years, much less that he would have made more than $800,000 worth of sales, was manifestly unsupported and the result of speculation.

Slip op. at 19.

I beg to differ. In cases like the instant case where the *fact* of damages from a defendant's misconduct is shown to a reasonable certainty, the innocent victim should not be required to show an exact dollar amount with mathematical precision. *See Story Parchment Co. v. Patterson Parchment Co.*, 282 U.S. 555, 75 L.Ed. 544; *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 90 L.Ed. 652. It is true that there can be no absolute certainty that Ozment would have made exactly the same sales for Ames, had Ames had the requisite support for its products, that Ozment made for IPC. Nevertheless, there is more evidence than the majority suggests. There is testimony that Ozment initially sold in the same territory (Charlotte); that he used the same sales methods; that he called upon the same customers he would have called on for Ames (he took his customer lists with him when he left); that he sold the same machine or one with only minor cosmetic differences; that he sold the TES-701s for IPC at a comparable price to that then being charged by Ames (he sold IPC's TES-701s for less than ten percent less than Ames was charging) and the NBI 3000 for almost $4,000 more; and that he was able to make these sales for IPC where he had been unable to do so for Ames because of the support factor. Due to Olivetti's own actions in making the TES-701 unmarketable by anyone not an NBI dealer, Ames is not in a position to show any closer figures of its lost sales than these, achieved by the same salesman selling the same or virtually the same machine to the same customers at comparable or greater prices in the same territory. The trial court so found, saying of Perry's lost profit computations, "The Court finds that these projections are reasonable, particularly in view of the fact that Olivetti's wrongful conduct caused Ames to take actions which make more definite projections difficult to ascertain." Because Olivetti has placed Ames in this position, it should not be permitted to complain that Ames' damages cannot be measured with the exactness and precision that might otherwise be possible. Accordingly, I believe not only that Ozment's sales for IPC are a proper measure of Ames' lost sales, but also that it is a just and reasonable inference that Ozment would have made approximately the same sales for Ames.

I also note that the majority states that the trial court concluded that the proper measure of damages was the sales Ozment made for IPC during the three years after Ozment left Ames. Slip

op. at 13. What the trial court actually found was that Perry projected that Ames' profits would have been $77,000 in 1982, $121,000 in 1983, and $203,000 in 1984, based upon Ozment's sales for IPC and Perry's experience with operating costs and with related service sales and costs. This finding is supported by Perry's testimony. Thus, Perry was not basing his figures on *IPC's* profits; he was basing them on Ozment's *sales* and applying Ames' own historical experience to these sales to determine what profit *Ames* would have made had Ozment made these sales for Ames. Use of this method, on the facts of this case, permits a just and reasonable inference as to the extent of Ames' damages.

The trial judge did find that had it not been for Olivetti's fraud, Ames could have become an NBI dealer. The majority holds that this finding is not supported by competent evidence. It says:

> In order for Ames to show that it was deprived of an opportunity to make profits, it must first show that there was in fact such an opportunity. The trial judge found as a fact that Ames, in reliance on Olivetti's misrepresentations, passed up the opportunity to become an NBI dealer. We hold, however, that there was no competent evidence to support this finding. There was no evidence that NBI ever offered a dealership to Ames. On the contrary, the testimony from Downs, the NBI representative, was that no such offer was made. Although a firm offer is not a prerequisite for recovery under a lost opportunity theory, *Rannbury-Kobee Corp. v. Miller Machine Co., Inc.*, 49 N.C. App. 413, 271 S.E. 2d 554 (1980), Downs also testified that Ames did not appear to qualify financially for such an undertaking. Perry, Ozment, and Harrison, all employees or former employees of Ames, testified that after the meeting with Downs, Ames decided not to pursue becoming an NBI dealership. While these witnesses were competent to testify to their own intentions, they were not competent to testify that NBI would ever have made a dealership offer to Ames. There was, therefore, no competent evidence before the judge to support his finding that Ames could have become an NBI dealership.

Slip op. at 16.

I am unable to understand the majority's reasoning in this respect. Perry gave positive testimony that he could have raised the money required had Ames decided to pursue a dealership with NBI. If, as the majority opinion suggests, Ames' ability to raise the necessary money were the only reason Ames would not have become an NBI dealer, I fail to see why Perry's testimony about the amount of money available to him is *not* competent evidence, while Downs' testimony that Ames did not "appear" to qualify financially *is* competent, especially in light of the fact that Ames never submitted a financial statement to NBI. Downs' testimony supports a conclusion that Ames' supposed financial deficiency was its only drawback from NBI's standpoint. Downs said that aside from any financial question,

> I was very much impressed with the three other people that were in the room when we had those discussions. They seemed to have—they were very committed to and very knowledgeable about a related product, the Olivetti 701 which NBI manufactured for Olivetti during that period of time. That I had a comfort level that they could be successful, those people could be successful in selling, supporting, and servicing the NBI product line.

Perry testified that Ames failed to pursue the NBI dealership further because the NBI machine was essentially identical and more expensive than the TES-701, and he would thus only be competing with himself if he took on the NBI line; Downs also testified that although Ames could have continued to be an Olivetti dealer as far as NBI was concerned, NBI would not have allowed Ames to sell both the TES-701 and the NBI 3000 for that very reason. Accordingly, I believe that there is sufficient evidence to support the trial judge's findings.

Furthermore, I do not agree that in order to recover damages, Ames had to show that it would have become an NBI dealer but for Olivetti's fraud. In his finding summarizing Perry's computation of damages, the trial judge did say that Perry projected these profits "as an NBI dealer." However, as we have said before, the purpose of the requirement that the trial judge make findings of fact is so that the reviewing court may determine " 'from the record whether the judgment—and the legal conclusions that underlie it—represent a correct application of the

law.'" *Patton v. Patton*, 318 N.C. 404, 406, 348 S.E. 2d 593, 595 (1986). The findings should indicate the evidence relied upon by the judge. *Id.* What Perry actually said in the testimony upon which this finding is based was that these profits were his projections "if properly supported by Olivetti or if I had taken the MBI [sic] product . . . ." His testimony described his written calculations, introduced into evidence, and entitled "Damages through loss of opportunity to sell properly supported TES 701 or to convert Ames to NBI dealership." Perry himself made no distinction in reaching his figures. Indeed, the testimony reflected in the trial judge's findings, was that the product lines were essentially the same. The critical point, from Perry's testimony about the necessity for having support and Ozment's testimony that the factor that enabled him to sell the TES-701s for IPC was the availability of support, appears to be Ames' ability to get this support, which it would have done either if Olivetti had honored its commitments or if Ames had become an NBI dealer. Accordingly, the opportunity to become an NBI dealer was not critical to Perry's proof of lost profits.

For all of the above reasons I would hold that Ames has proved its damages with reasonable certainty and that the trial court did not err in so finding.

Chief Justice EXUM and Justice MARTIN join in this concurring and dissenting opinion.