STATIC CONTROL COMPONENTS,
INC., Plaintiff,

v.

DARKPRINT IMAGING,
INC., Defendant.

No. 1:99CV00612.

United States District Court,
M.D. North Carolina.

Feb. 7, 2002.

William L London, III, Sanford, NC, Jennifer Heisinger, Joseph C. Smith, JR., Bartlit Beck Herman Palenchar & Scott, Denver, CO, for plaintiff.

Laurie J. Bremer, Douglas W. Kenyon, Matthew Patrick McGuire, Hunton & Williams, Raleigh, NC, Timothy P. Getzoff, Donald A. Degnan, Christopher H. Toll, Holland & Hart, LLP, Boulder, CO, for defendant.

## MEMORANDUM OPINION

TILLEY, District Judge.

This case comes before the Court on Defendant's Motion for Summary Judgment [Doc. # 61]. For the reason stated below, the Defendant's motion is DENIED.

### I. Factual Background

Plaintiff Static Control Components, Inc. is a North Carolina corporation which distributes aftermarket[1] components and toner for remanufactured laser toner cartridges. Static Control claims that Defendant Darkprint Imaging, Inc. misappropriated its trade secrets, tortiously interfered with its employment agreements, and engaged in unfair trade practices. The facts of this case, stated in the light most favorable to the Plaintiff, are as follows:

Static Control entered the aftermarket toner distribution market in 1992. After encountering some early difficulties evaluating different toners and matching them with various components used in rebuilding diverse cartridges, Static Control hired Lauren Hulse, an experienced toner scientist, in February 1993. Although Mr. Hulse was experienced with toner for original equipment manufacturers, he was not experienced in the toner aftermarket. As a condition of his employment, Mr. Hulse signed a non-disclosure and non-competi-

tion agreement containing the following language:

I agree to treat all of this information regarding these products as the property of Static Control Components, Inc. I agree not to reveal any data regarding these products to any business enterprise or individual without the written permission of Static Control Components, Inc.

In the event that I terminate my consultation association with Static Control Components, Inc., I agree not to compete directly or indirectly with Static Control Components, Inc. in its manufacturing and/or distribution of supplies to remanufacturers of laser printer cartridges for a period of two (2) years from the date of last compensation from Static Control Components, Inc.

Mr. Hulse's main responsibilities included setting up a toner lab and determining which aftermarket toner sources would provide quality toner. Mr. Hulse's department, which included two other employees, was able to identify eight aftermarket toner products within eleven months of his employment. Aside from developing toner products, Mr. Hulse also traveled to toner conventions to advertise Static Control's products.

Darkprint originally sold aftermarket toner supplies but not toner itself. In 1995, however, Darkprint's vice president Michael Gaylord met Mr. Hulse at a toner convention. Mr. Gaylord, who admired Static Control's toner products, remarked to Mr. Hulse, "Boy, I wish we had your toner," to which Mr. Hulse replied, "Well, maybe you can." After this conversation, Darkprint began pursuing several of Static Control's employees. Darkprint first approached Gary Schut, one of Static Con-

---

1. The aftermarket can be contrasted with new toner products developed by original equip-  ment manufacturers.

trol's technical support employees, in October 1995. Darkprint eventually hired Mr. Schut in March 1996, in part because of the relationships he forged with recharging companies[2] while working at Static Control. Darkprint next hired Mr. Hulse and Tommy Daniel, one of Static Control's product development specialists, in July 1996. Finally, Darkprint hired Heather Marino in 1997 and Leonard Gunter in 1998, both of whom were former Static Control sales associates.

While Darkprint was wooing Mr. Hulse, it was aware of Mr. Hulse's non-disclosure and non-competition agreements with Static Control. In fact, Mr. Gaylord sent a letter to Mr. Hulse explaining his perception of the legal consequences of such agreements. Mr. Gaylord advised Mr. Hulse that the agreement might be invalid, but, if it was enforceable at Darkprint's corporate headquarters, Darkprint could always set up paper headquarters in California where Mr. Gaylord had been advised that the non-competition agreement would not apply. Darkprint thus lured Mr. Hulse away from Static Control, even though it was aware of the non-competition agreement.

After Mr. Hulse agreed to work for Darkprint, Darkprint prepared for its new toner distribution operation by organizing development space, ordering toner supplies and testing equipment, and advertising its new product line. Darkprint did not, however, hire any other toner scientists and did not actually begin its preparations until Mr. Hulse began work. Darkprint was able to develop and market five toners within four months of Mr. Hulse's arrival and another six toners within seven months of Mr. Hulse's employment. Static Control alleges that Darkprint's ability to specify and market these toners in this time frame was unusually fast. Static Control claims that the only explanation for Darkprint's fast distribution rate is that Mr. Hulse and other Static Control employees divulged Static Control trade secrets for Darkprint's use.

Static Control alleges that Darkprint used Static Control's trade secrets, which it discovered through Static Control's former employees, to determine appropriate toners and target particular customers. Static Control further contends that Darkprint used Static Control's former employees to learn which vendors were reliable, how to acquire vendor discounts, and which customers would be susceptible to Darkprint's new toner products. To support its claims, Static Control points to Darkprint's practice of hiring Static Control's employees, the conversation between Mr. Gaylord and Mr. Hulse, the overlap of customers between Static Control and Darkprint, and the unusually short time period in which Darkprint developed its toner products.

Static Control alleges that Darkprint's behavior constitutes trade secret misappropriation, tortious interference with contract, and unfair trade practices. Darkprint, however, contends that Static Control has not provided sufficient evidence or a legal basis to support its claims.

## II. Summary Judgment

Darkprint has moved for summary judgment against each of Static Control's causes of action. Summary judgment is only proper when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of any material fact and the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Cox v. County of Prince William*, 249 F.3d 295, 299 (4th

**2.** Recharging companies fill printer cartridges    with toner after the original toner runs out.

Cir.2001). Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence. *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. *Anderson,* at 248, 106 S.Ct. 2505; *Cox,* at 299. The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. *Anderson,* at 248, 106 S.Ct. 2505; *Cox,* at 299; *Solers, Inc. v. Hartford Cas. Ins. Co.,* 146 F.Supp.2d 785, 791 (E.D.Va.2001). The party opposing the motion may not rest upon its pleadings but must instead provide evidence or point to evidence already on the record that would be sufficient to support a jury verdict in its favor. *Anderson,* at 248, 106 S.Ct. 2505. This evidence must be properly authenticated pursuant to Rule 56(e). *Orsi v. Kirkwood,* 999 F.2d 86, 92 (4th Cir.1993).

### A. Misappropriation of Trade Secrets

Darkprint argues that Static Control has not identified with specificity which trade secrets Darkprint allegedly used. Furthermore, Darkprint claims that Static Control has not provided sufficient evidence of use of trade secrets to support its trade secret misappropriation claim.

Darkprint's alleged misappropriation of trade secrets is governed by the North Carolina Trade Secrets Protection Act. The Act provides that:

> Misappropriation of a trade secret is prima facie established by the introduction of substantial evidence that the person against whom relief is sought both: (1) Knows or should have known of the trade secret; and (2) Has a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner.

N.C.G.S. § 66–155. *See North Carolina Elec. Membership Corp. v. North Carolina Dep't of Econ. and Cmty. Dev.,* 108 N.C.App. 711, 718–19, 425 S.E.2d 440, 445 (1993) (determining that sections (1) and (2) are the elements required for trade secret misappropriation).

The Act also defines "misappropriation" and "trade secrets" as follows:

> (1) 'Misappropriation' means acquisition, disclosure, or use of a trade secret without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained by another person with a right to disclose the trade secret.

> (3) 'Trade secret' means business or technical information, including, but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

> b. Is the subject of efforts that reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66–152.

■ Darkprint first argues that Static Control has not sufficiently defined its trade secrets and has merely alleged vague categories without providing specific facts. Darkprint argues that without more specific information, it is impossible to determine if it has in fact misappropriated Static Control's trade secrets.

Although Darkprint claims that Static Control has alleged only vague categories, Static Control has adequately defined its trade secrets for the purposes of summary

judgment. Static Control identified its customer list, vendor lists, and technical information as trade secrets accessed by Darkprint. While categories alone would not sufficiently support Static Control's claims, *Bank Travel Bank v. McCoy,* 802 F.Supp. 1358, 1360 (E.D.N.C.1992), aff'd. *sub nom Amariglio–Dunn v. McCoy,* 4 F.3d 984, 1993 WL 341047 (4th Cir.1993), Static Control has produced the actual customer list and vendor information that it claims are trade secrets. *See* Doc. # 78, Exhibit T (customer list information). Furthermore, Static Control has provided Defendant with a list of Static Control Components, Inc. employees who can explain in detail which technical information is classified as a trade secret. Static Control provided Darkprint this information in the early stages of discovery and Darkprint has had ample time to depose the employees and determine the scope of the technical information trade secret. Darkprint has acknowledged that it has had access to this information for months and has not attempted to issue further interrogatories or contact any of the employees. Static Control has provided adequate information about its trade secrets to withstand summary judgment.

■ Darkprint also argues that, assuming the trade secrets are adequately defined, Static Control has not presented sufficient evidence to demonstrate that Darkprint has in fact misappropriated any trade secrets. In order to provide a prima facie case for trade secret misappropriation, Static Control must offer substantial evidence that the defendant "(1) [k]nows or should have known of the trade secret, and (2)[h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed or used it without the express or implied consent of the owner." N.C.G.S. § 66–155. Darkprint places great weight on the fact that Static Control has no direct evidence and dismisses

Static Control's circumstantial evidence as speculative and insufficient.

A party cannot withstand summary judgment if it offers only mere speculation of misappropriation instead of evidence supported by facts. *See Azie v. BellSouth Adver. and Publ'g Corp.,* 86 F.Supp.2d 552, 556 (W.D.N.C.2000) (noting that allegations and speculation alone are insufficient in the face of a motion for summary judgment in civil rights cause of action); *Friel v. Angell Care, Inc.,* 113 N.C.App. 505, 510, 440 S.E.2d 111, 114 (1994) (stating that conclusory allegations are insufficient unless supported by facts in a malicious interference with contract claim). Static Control has not, however, rested on bare allegations and speculation. Static Control has instead provided a strong circumstantial case indicating that Darkprint may have misappropriated its trade secrets. North Carolina has determined that circumstantial evidence can be sufficient to demonstrate a trade secret misappropriation case, especially because the nature of the cause of action makes it difficult to obtain direct evidence. *See Byrd's Lawn and Landscaping, Inc. v. Smith,* 142 N.C.App. 371, 377, 542 S.E.2d 689, 693 (N.C.App.2001) (noting that circumstantial evidence can be sufficient to support a trade secret misappropriation cause of action).

To support its claim, Static Control offers strong circumstantial evidence that poses a genuine issue of material fact. Static Control first points to the fact that Darkprint hired five employees away from Static Control. These five employees had access to Static Control's confidential information, including customer information, vendor lists, and technical information. Static Control contends that Darkprint hired these five employees in order to exploit their knowledge of Static Control's trade secrets. Static Control claims that

Darkprint's ability to distribute thirteen toners within eight months of hiring Mr. Hulse strongly indicates that Mr. Hulse was divulging Static Control's trade secrets. There is dispute over whether the time period in which Darkprint was able to distribute toners was unusually short. This dispute presents a genuine issue of material fact as to whether the time period itself is indicative of misappropriation. Finally, Static Control offers testimony of Darkprint's vice president Mitch Gaylord engaged in a questionable discussion with Static Control's toner scientist Lauren Hulse. In the conversation, Mr. Gaylord told Mr. Hulse, "Boy, I wish we had your toner," and Mr. Hulse replied, "Well, maybe you can." Doc. # 78, Ex. G. Static Control's evidence presents a genuine issue of material fact as to whether Darkprint misappropriated Static Control's trade secrets. Taken as a whole, Static Control's circumstantial evidence is strong enough to withstand Defendant's motion for summary judgment.

Darkprint finally argues that Static Control did not institute sufficient measures to ensure the confidentiality of the trade secrets. Darkprint argues that Static Control allowed sales employees access to the alleged trade secrets without requiring them to sign confidentiality agreements. Although confidentiality agreements are one method used to protect confidential information, they are by no means the sole method. Static Control took steps to protect its customer information by disabling its sales associates from accessing both the customers and the vendors of toner that they purchased. While Static Control's sales associates did have access to some customer information, such as names, they did not have access to the records linking the customers to purchase histories. Static Control thus did take steps to protect its information. There is thus a genuine issue of material fact as to the adequacy of Static Control's protection of its trade secrets.

### B. Tortious Interference

Darkprint alleges that Static Control's tortious interference claims are unsupported by law and fact. Darkprint challenges both the non-competition and non-disclosure agreements as overbroad and alleges that Static Control has not sufficiently demonstrated actual damages.

#### i. Non–Competition Agreement

■ Static Control's claim for tortious interference with the non-competition agreement is based on Darkprint's employment of Mr. Hulse. Mr. Hulse, as noted *infra,* signed a global non-competition agreement with Plaintiff that restricted Mr. Hulse from competing with Static Control for two years if Mr. Hulse terminated his employment. Static Control alleges that Darkprint intentionally induced Mr. Hulse to break the non-competition agreement during and immediately following his employment with Static Control.

In order to establish a cause of action for tortious interference with the non-competition agreement, Static Control must show that: (1) there is a valid contract between Plaintiff and Mr. Hulse; (2) Darkprint knew of the contract; (3) Darkprint intentionally induced Mr. Hulse to breach the contract; (4) Darkprint acted without justification; and (5) Static Control suffered actual damages. *See Reichhold Chems., Inc., v. Goel,* 146 N.C.App. 137, 555 S.E.2d 281, 287–88 (2001). Static Control has provided evidence that Darkprint was aware of the agreement and intentionally induced Mr. Hulse to violate the agreement. Static Control has produced several letters from Darkprint to Mr. Hulse discussing the existence of the agreement and urging Mr. Hulse to get a copy of the agreement. Darkprint's letters to Mr. Hulse also indicate Darkprint's awareness that employing him would vio-

late the terms of the agreement. In one letter Darkprint contemplated setting up a "paper office" in California to take advantage of California law regarding non-competition agreements. Furthermore, the conversation between Mr. Gaylord and Mr. Hulse is evidence that Darkprint may have intended to hire Mr. Hulse to gain access to Static Control's trade secrets, which would not be a justification to interfere with the non-competition agreement.

Darkprint argues, however, that the non-competition agreement itself is invalid as a matter of law. For a non-competition agreement to be enforceable under North Carolina law, it must be: (1) in writing; (2) part of an employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) designed to protect a legitimate business interest. *See Farr Assocs., Inc. v. Baskin,* 138 N.C.App. 276, 279, 530 S.E.2d 878, 881 (2000). The plaintiff has the burden of proving the reasonableness of the agreement. *Hartman v. W.H. Odell & Assocs., Inc.,* 117 N.C.App. 307, 311, 450 S.E.2d 912, 916 (1994). The reasonableness of the time and place of the restrictions should be looked at "in tandem." *Id.* at 311, 450 S.E.2d at 916. Darkprint argues that the global scope of the agreement, when considered in conjunction with the two-year time limit, is overbroad and renders the agreement invalid.

North Carolina has not held that global non-competition agreements are per se invalid. *See Market Am., Inc. v. Christman–Orth,* 135 N.C.App. 143, 153–54, 520 S.E.2d 570, 578 (1999) (finding a global non-competition agreement with strict time and content restriction valid). North Carolina, however, holds restraints on trade such as non-competition agreements in disfavor. *See Farr Assocs.,* at 881. In *Market America,* the court upheld a global non-competition agreement with a six-month time limit. The agreement in *Mar-*

*ket America,* however, was narrowly tailored to a short time frame and specific, similar products. *Market America,* at 153–54, 520 S.E.2d 570. In several other cases, global non-competition agreements with longer time limitations and fewer restrictions have been rejected as overbroad. *See American Hot Rod Assoc., Inc., v. Carrier,* 500 F.2d 1269 (4th Cir.1974) (applying North Carolina law) (invalidating a non-competition agreement with no geographical limits and a five-year term); *Professional Liab. Consultants, Inc. v. Todd,* 345 N.C. 176, 478 S.E.2d 201 (N.C. 1996) (adopting the dissenting Court of Appeals opinion that found that a global non-competition agreement with a five-year term overbroad).

Because North Carolina has no definitive rule regarding global non-competition agreements, it is necessary to analyze the validity of the non-competition agreement in light of the geographic reasonableness factors enumerated in *Hartman*. *Hartman* laid out the following factors to determine the reasonableness of the geographic scope of non-competition agreements: (1) the scope and area of the restriction; (2) the employee's assigned area; (3) the area in which the employee worked; (4) the area where the employer operated; (5) the nature of the business; and (6) the nature of the employee's work and his duty and knowledge of the employer's business. *Hartman,* at 312, 916. If the geographic scope of the agreement is too broad, the whole agreement must fail and will not be altered. *Hartman,* at 312, 917.

In this case, the scope of the restriction is boundless, which, as noted above, is looked upon with disfavor. Mr. Hulse worked primarily out of the Sanford, North Carolina office. Mr. Hulse did, however, travel to national toner conventions to advertise Static Control's toners. Static Control's business was focused on

toner and aftermarket printer cartridge components, which were the object of Darkprint's employment offer to Mr. Hulse. Furthermore, Mr. Hulse was a trusted employee with access to Static Control's confidential information because he was the toner scientist who oversaw the selection of Static Control's toners.

Darkprint contends that the geographic scope is unreasonable because Static Control's area of operation was not worldwide. Static Control, however, claims that it is a worldwide operation with international customers and vendors. To support this claim, Static Control submitted the affidavit of William Swartz, President of the Imaging Division of Static Control. The affidavit states that Static Control has "sold imaging supplies worldwide from its inception," and distributes products to Europe, the Middle East, Asia, Latin America and Africa. See Doc.# 78, Ex. A. The affidavit also states that Static Control has distributors in Argentina, Canada, Mexico, Brazil, Japan, Australia, New Zealand, and Ukraine. See id. Furthermore, Static Control has provided a detailed customer list that includes foreign customers. See Doc. # 78, Ex. T.

Static Control's evidence for the worldwide scope of the non-competition agreement provides sufficient support for validity of the non-competition agreement. Worldwide non-competition agreements are only valid if they are supported by specific evidence. See Hartman, at 313, 917 (stating that "indefinite generalit[ies]" are insufficient to support the global reach of a non-competition agreement). Static Control supports its claim that the agreement is geographically reasonable with an affidavit and a detailed customer sales list. While William Swartz's affidavit is relatively general, the customer sales list provides enough additional information to validate the geographic scope of the agreement. Static Control's evidence

is thus specific enough to withstand Darkprint's motion for summary judgment regarding the geographic scope of the agreement.

■ Darkprint also challenges the validity of the tortious interference claim on the grounds that Static Control has failed to demonstrate actual damages. Darkprint contends that Static Control's damages evidence is supported only by speculation and "concocted by an unqualified layperson." Doc. # 73, Defendant's Brief at 19. Darkprint also argues that Static Control has only offered "possible theories of monetary recovery" and has not provided expert reports, calculations or facts to support its theories. Doc. # 74, Defendant's Reply in Support of its Motion for Summary Judgment. Darkprint thus claims that Static Control has not presented any legitimate facts to support a finding of actual damages.

The burden of proving actual damages is on the plaintiff. See Olivetti Corp. v. Ames Business Systems, Inc., 319 N.C. 534, 547–48, 356 S.E.2d 578, 586 (1987). As part of this burden, the plaintiff must demonstrate that its measure of damages is reasonably certain. Id., at 546, 356 S.E.2d at 585. The reasonable certainty standard requires more than speculation, but does not require absolute certainty. See Southern Bldg. Maintenance, Inc., v. Osborne, 127 N.C.App. 327, 332, 489 S.E.2d 892, 896 (1997). Once a plaintiff demonstrates the fact of damages with reasonable certainty, courts often allow plaintiffs some flexibility in showing the actual amount of damages. See Olivetti at 552, 589 (Frye, J., dissenting) (noting that courts provide plaintiffs broad room to demonstrate the amount of damages when the fact of damages has been proven in wrongful conduct cases); see also Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555, 576, 51 S.Ct. 248, 250, 75

L.Ed. 544 (1931) (stating that plaintiffs should have some latitude in arguing uncertain damages when defendant's wrongdoing is the source of the uncertainty). There is no bright-line standard to determine damages in tortious interference actions and each case must be analyzed based on its unique facts. *See Byrd's Lawn & Landscaping,* at 378, 693.

Static Control alleges actual damages resulting from lost profits, price erosion, development costs, and lost goodwill. In support of its actual damages claim, Static Control has presented William Swartz's deposition testimony, profit calculations and customer sales information. The deposition evidence is, as Darkprint argues, mere speculation and does not rise to the level of reasonable certainty. *See* Doc. # 78, Ex. V. Mr. Swartz was unable to give any reasonable approximation of price erosion or lost sales damages and could not even speculate, claiming that those damages were very difficult to quantify. *See id.,* at 98–102 (stating that Mr. Swartz was unable to determine if the damages were closer to nothing or $100 million and that calculating lost sales damages would be "very painstaking").

Static Control's profit and customer sales information, however, is far more certain. Static Control has provided graphs indicating the sales decline following Mr. Hulse's employment with Defendant. Static Control has also provided sales information describing which toner customers began using Darkprint's toner products after Mr. Hulse's move. Static Control's evidence provides information on overlapping customers, sales figures, and the number of sales that Darkprint generated from Static Control's customers.

Static Control has provided evidence of actual damages sufficient to withstand Darkprint's motion for summary judgment. Static Control's damages evidence presents figures that are reasonably cer-

tain and which the jury will be able to consider. Although the deposition evidence is speculative at best, Static Control's other damages evidence provides enough information to determine lost profits. There is therefore a genuine issue of material fact on the actual damages claim.

ii. Non–Disclosure Agreement

Darkprint is also moving for summary judgment on Static Control's claim for tortious interference with the non-disclosure agreement. Darkprint argues that the non-disclosure agreement is overbroad and invalid as a matter of law because the agreement is not limited to confidential information.

For a non-disclosure agreement to be valid, it must cover only confidential information. *See Kadis v. Britt,* 224 N.C. 154, 29 S.E.2d 543 (1944); Restatement (Third) of Unfair Competition § 41(d) (noting that "a promise to refrain from the use or disclosure of commercial information is ordinarily unenforceable unless the information is sufficiently secret to justify the restraint"). Non-disclosure agreements that do not involve a breach of confidence or that prohibit an employee from using his general knowledge and skill are overbroad. *Kadis,* at 162, 29 S.E.2d at 548.

Darkprint argues that the non-disclosure agreement between Mr. Hulse and Static Control covers all of the information and knowledge Mr. Hulse acquired while employed with Static Control. The agreement states that Mr. Hulse must treat all information regarding the manufacture and distribution of laser printer toner cartridge as the property of plaintiff and that Mr. Hulse should not reveal any "data" in connection with Static Control's products. The agreement does not state that it is limited to secret or confidential material and thus Darkprint argues that it is fatally overbroad.

Static Control argues, however, that the agreement is restricted to confidential in-

formation. Static Control points to the fact that the agreement uses both "information" and "data," and contends that the use of different words indicates different meanings. Static Control claims that "data" necessarily indicates confidential material whereas "information" is a broader term.

Static Control's interpretation of the agreement presents a genuine issue of material fact as to the scope of the nondisclosure agreement. Because there is a disputed fact situation, and the facts must be viewed in the light most favorable to the plaintiff, Darkprint's motion for summary judgment on the tortious interference with the non-disclosure claim is denied. Darkprint's argument that this claim is unsupported by specific evidence of actual damages is similarly rejected because, as explained *supra,* Static Control has provided adequate damage evidence.

### C. Unfair Trade Practices

■ Darkprint next moves for summary judgment on Static Control's unfair trade practices claim. Darkprint, relying principally on its reasoning in the trade secret misappropriation and tortious interference motions for summary judgment, contends that Static Control has not offered sufficient evidence of unfair trade practices.

To establish a claim for unfair trade practices, the plaintiff must show that: (1) the defendant engaged in an unfair or deceptive act or practice, or unfair means of competition, (2) that is in or affects commerce, (3) that is the proximate cause of plaintiff's actual injury. *Walker v. Sloan,* 137 N.C.App. 387, 395, 529 S.E.2d 236, 243 (2000). An act is "unfair" under § 75–1.1 if it is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers." *Id.,* at 399, 529 S.E.2d at 245 (quoting Jones v. Capitol Broad. Co., 128 N.C.App. 271, 276, 495 S.E.2d 172, 175 (1998)).

Static Control claims that Darkprint engaged in unfair trade practices by intentionally luring Static Control employees to work for Darkprint, exploiting those employees' knowledge of Static Control's trade secrets, and using Static Control's trade secrets to compete with Static Control. Static Control urges that Darkprint's behavior in soliciting its employees, some while still employed with Static Control, and misappropriating Static Control's trade secrets proximately caused Static Control to lose toner sales and profits as well as its investment in trade secrets and customer and vendor relationships.

Static Control has provided evidence sufficient to create a genuine issue of material fact on its unfair trade practices claim. Both Darkprint and Static Control agree that the unfair trade practices claim rested heavily on the misappropriation and tortious interference claims. The evidence is sufficient to pose a genuine issue of material fact as to whether Darkprint engaged in unfair trade practices. Furthermore, Static Control, as discussed *supra,* has presented sufficient evidence of actual damages in the form of lost profits to withstand Darkprint's motion for summary judgment. Darkprint's motion for summary judgment on Static Control's unfair trade practices claim is therefore denied.

### III. Conclusion

In conclusion, Darkprint's motion for summary judgment on Static Control's trade secret misappropriation claim is DENIED. Darkprint's motion for summary judgment on Static Control's tortious interference claim is DENIED. Finally, Darkprint's motion for summary judgment on Static Control's unfair trade practices claim is DENIED.