***********
The Full Commission has reviewed the prior Decision and Order based upon the record of the proceedings before Chief Deputy Commissioner Taylor and the briefs and arguments of the parties. The appealing party has shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence *Page 2 
of record, the Full Commission AFFIRMS with modifications the Decision and Order of Chief Deputy Commissioner Taylor.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are properly before the Industrial Commission.
2. There are no questions of nonjoinder or misjoinder.
3. The Industrial Commission has jurisdiction over the parties.
4. The Industrial Commission has jurisdiction over the subject matter of this dispute.
5. Larry Williamson (hereinafter "Williamson") was employed by the North Carolina Department of Transportation as an inspector for the Division of Motor Vehicles from June 1, 1985 to March 31, 2004.
6. In response to his inquiry regarding retirement and his eligibility for the law enforcement officers supplement, Ms. Laurie Moser (hereinafter "Moser"), a retirement and benefits representative for the North Carolina Department of Transportation mistakenly informed Williamson that he would not be eligible for the supplement immediately upon retirement, but would be eligible when he reached age 55.
7. Counsel for the parties stipulated at trial that Moser testified at her deposition that it was reasonable for Williamson to rely on the retirement information she gave him and the information she gave him regarding his entitlement to the law enforcement officers' supplement.
8. Williamson has not received any supplement payments although he has reached the age of 55. *Page 3 
9. The issues to be determined from this hearing are:
 a. Did Moser negligently misrepresent to Williamson that he would be entitled to the law enforcement supplement if he retired?
 b. Whether the incorrect information provided to Williamson by Moser proximately caused him any damages?
 c. Has Williamson been damaged by the negligent misrepresentation by Moser?
 d. To what amount of damages is Williamson entitled?
 *********** EVIDENCE ADMITTED
1. Plaintiff's Exhibit #1: Report of Examination of Motor Vehicle — Plaintiff faxed on January 12, 2004 to Gardner after inspection;
2. Plaintiff's Exhibit #2: Application for 1937 truck in name of Kinlaw, dated January 29, 2004;
3. Plaintiff's Exhibit #3: Report of Exam of Vehicle, dated January 29, 2004 filled out by Holland;
4. Plaintiff's Exhibit #4: NADA book photo static sheet;
5. Plaintiff's Exhibit #5: January 5, 2004 letter to Kinlaw from DMV;
6. Plaintiff's Exhibit #6: LEO Supplement;
7. Plaintiff's Exhibit #7: Letter from Williamson's attorney to Secretary of Transportation Lyndo Tippett;
8. Plaintiff's Exhibit #8: Deposition of Jimmy Edwards, dated January 31, 2008;
9. Defendant's Exhibit #1 — March 29, 2004 Internal Affairs Rights; *Page 4 
10. Defendant's Exhibit #2: Intent to Retire Notice, dated March 29, 2004 by Plaintiff;
11. Defendant's Exhibit #3: Memo from Major Robinson to Williamson, dated March 29, 2004;
12. Defendant's Exhibit's 4: March 30, 2004 letter from Edwards to Williamson;
13. Defendant's Exhibit's #5: Handwritten note from Edwards to Williamson regarding contacting Moser;
14. Defendant's Exhibit's #6: Plaintiff's Application for Retirement, dated March 31, 2004;
15. Defendant's Exhibit's #7: Internal Affairs Report of Investigation by Captain Greg Lockamy; and
16. Defendant's Exhibit's #8: Williamson's deposition, dated September 17, 2008.
 ***********
The competent evidence of record engenders the following:
 FINDINGS OF FACT
1. Williamson, born January 19, 1953, was employed by the North Carolina Department of Transportation (hereafter "DOT") as a Division of Motor Vehicles (hereafter "DMV") inspector beginning in June 1985. Prior to that time, he had worked as a police officer for the City of Clinton, North Carolina from 1975 until May 1985.
2. In late 2003 or early 2004, after contacts with Thomas Williams, the owner of Williams Used Cars who had offered him employment on more than one occasion, Williamson began preliminarily exploring the possibility of retiring from the DMV. *Page 5 
3. In late 2003 or early 2004, Williamson made inquiries of Moser, a retirement and benefits representative for DOT, about retirement benefits and whether he would be eligible for the North Carolina Law Enforcement Supplement if he retired at that time. The Law Enforcement Supplement is a substantial benefit law enforcement officers work towards during their active duty. It is a major factor in the amount of time they work and is often determinative in their retirement planning. Such was the case for Williamson.
4. Moser informed Williamson that he could retire at 50 years old and receive benefits, and he would not be eligible for the supplement immediately after retirement, but would be eligible for the supplement when he reached age 55.
5. Counsel for the parties stipulated at trial that Moser testified at her deposition that it was reasonable for Williamson to rely on the information she gave him regarding his entitlement to the law enforcement supplement.
6. Williamson worked as the Acting Assistant Supervisor for District 3 in the Raleigh district office for the month of March 2004. He was notified on Friday, March 26, 2004, that he was to work again in the Raleigh district office on the following Monday, March 29, 2004.
7. During the morning of March 29, 2004, Williamson again contacted Moser through the Raleigh district office secretary, Sabrina Bartley, to ensure that he would be eligible for the supplement when he reached age 55. Bartley informed Williamson that Moser confirmed to her that the he would be eligible for the supplement once he reached age 55.
8. Later that day, Williamson met with Captain Lockamy and Bozard at the New Bern Avenue DOT offices relative to an investigation of Williamson's conduct in inspecting damaged motor vehicles. *Page 6 
9. Prior to beginning their conversation with Williamson, Captain Lockamy and Bozard gave Williamson a document captioned "INTERNAL INVESTIGATION RIGHTS" which provided in part that:
 If you refuse to answer questions or do not answer questions truthfully, you may be subject to disciplinary action for insubordination, which could result in your dismissal from the Division of Motor Vehicles License and Theft Bureau. If you do answer questions, neither your statements, nor any information or evidence which is gained by reason of such statements may be used against you in any subsequent criminal proceeding. Your statement may be used against you in subsequent department disciplinary action.
10. Captain Lockamy testified at trial that Williamson testified truthfully and told him that if the question was whether he had ever conducted either a pre or final inspection of a vehicle without actually looking at the vehicle the answer was "Yes." Williamson added, however, that he did not believe that he had ever conducted both a pre-inspection and final inspection of a vehicle that he had not physically looked at either before or after the repairs were made.
11. Williamson explained to Captain Lockamy that from time to time he had performed a pre-inspection or final inspection from the photo of a vehicle but he had always physically examined vehicles at some point, either before or after they were reconstructed.
12. Captain Lockamy asked Williamson why he had not always done both a physical examination for the pre-inspection and final inspection, to which Williamson responded that it was for the benefit of the dealer.
13. Williamson testified that there is no inspector in the State of North Carolina who could keep up with automobile inspections in his assigned area if he did them all by the book. Williamson testified that if an inspector is forced to cut corners to keep up with his duties, an *Page 7 
inspector should do so with a dealer that he has dealt with for years and never had any complaints about. Williamson followed that course.
14. It was undisputed that Williamson had never had any complaints about Don's Body Shop during his tenure at DMV. Rather than making Don's Body Shop close down until he could arrive to inspect vehicles to be repaired, Williamson signed off on some inspections without physically examining vehicles.
15. In early 2004, just prior to his meeting with Captain Lockamy and Bozard, Williamson had been involved in a controversy at the DMV when he was pressured by a superior to title a vehicle belonging to a friend of the DMV Commissioner as a 1937 Ford truck when the vehicle was actually a "kit car" and not a 1937 Ford. After inspecting the vehicle, Williamson had refused to confirm that the vehicle was, in fact, a 1937 Ford, but rather, certified that it was a "kit car" complete with a digital speedometer. After receiving the license plate for the "kit car" and documents related thereto, Williamson was contacted by a representative from DMV and told not to put the plate on the 1937 "kit car" and return it to the DMV. Williamson did as instructed. The "kit car" was ultimately titled as a 1937 Ford by a different inspector from Fayetteville, L. W. Holland, in February 2004. This incident resulted in adverse publicity for DOT and DMV in the "Kinlaw matter."
16. Not eager to become involved in another controversy, or continue the interrogation with Captain Lockamy and Bozard, and having already been advised by Moser that he was entitled to full retirement benefits, including the supplement, and that he had been in prior discussion about employment with Thomas Williams of Williams Used Cars, Williamson decided that he would retire immediately and ended the meeting by informing both participants of his intention. Williamson was 51 years old. *Page 8 
17. In response, Captain Lockamy asked Williamson if he really wanted to retire. Williamson, knowing that he had already verified with Moser that he would be eligible for the supplement at age 55 and that he had a job waiting for him with Williams, told Bozard and Captain Lockamy that he was certain of his decision to retire.
18. Captain Lockamy then left the meeting and went to speak with Licensing and Theft Bureau Director John Robinson to determine whether Williamson could retire effective immediately. Williamson drafted a document setting forth his intention to retire that was witnessed by Bozard and Captain Lockamy.
19. Williamson then met with Director Robinson and Assistant Director Jimmy Edwards for a brief period during which they exchanged pleasantries. Thereafter, Bozard drove Williamson home.
20. Williamson heard nothing else about the investigation after that time. DOT's witnesses also testified at trial that the investigation ended when Williamson retired. No evidence was presented by DOT that any further actions were taken with regard to Don's Body Shop.
21. A day later, March 30, 2004, Bozard visited Williamson's home delivering a note from John Robinson informing Williamson that he needed to contact Moser, a DOT retirement benefits specialist, regarding his retirement benefits.
22. Williamson and his wife, Susan, went to 1100 New Bern Avenue, Raleigh, North Carolina on March 31, 2004 and met with Moser, who gave him the estimate of the amount of his retirement benefits and the estimated amount of his supplement when he reached the age of 55.
23. Moser estimated that Williamson's supplement would be $955.00 per month when he reached age 55 and would continue until he was eligible for Social Security. *Page 9 
24. Three days after he retired, Williamson took employment with Williams, who essentially entrusted operation of his used car business, Williams Used Cars, to Williamson. Williamson worked for Williams until September 2004 when Williams closed his business for health reasons.
25. At some point after their meeting with Williamson, Captain Lockamy and Bozard prepared a document captioned "Internal Affairs Report of Investigation" in which they concluded that there was sufficient evidence to sustain the allegations against Williamson but made no recommendations as to whether Williamson should be disciplined.
26. Two months after his retirement, on May 27, 2004, Williamson learned from speaking with Mike Ward, his former partner at the DMV, that he might not be eligible for the supplement despite Moser's repeated representations to the contrary.
27. On May 28, 2004, Williamson again contacted Moser to speak with her about his eligibility for the supplement. Moser informed him that it appeared that the information she had given him about his eligibility for the supplement was incorrect, but she had given Williamson the information that had been provided to her by her supervisor. Moser also stated that she was trying to meet with Jimmy Edwards, the Deputy Director, to determine what they were going to do to rectify the mistake.
28. Moser eventually confirmed for Williamson that she had spoken with Edwards, and Edwards confirmed he also thought that Williamson was eligible for the supplement. Moser and Edwards subsequently determined that Williamson was not, in fact, eligible for the supplement. She reported that they submitted the matter to Robin Hicks who would contact Williamson as soon as they could determine what they were going to do. *Page 10 
29. Hicks, Moser's superior at DOT, contacted Williamson on June 29, 2004, and told him that the information he received was a mistake, and she could not rectify the mistake as Williamson was not eligible for the supplement. Williamson responded that he retired based on the information that he was given by Moser that he would be eligible for the supplement. Hicks finally told him that he was not "going to get it" and hung up.
30. Williamson relied upon the information he was provided by Moser regarding his eligibility for the North Carolina Law Enforcement Supplement in reaching his decision to retire.
31. Moser negligently informed Williamson that he would be eligible for the North Carolina Law Enforcement Supplement once he reached age 55.
32. It was not reasonable for Williamson to seek employment as a law enforcement officer after he retired and had been employed by Williams for nearly four months before being informed by DOT that he would not receive the supplement benefit promised. The greater weight of the evidence compels a finding that he would not have been hired by another law enforcement agency because of his age and the fact that agency would then have become responsible for paying the entire amount of his North Carolina Law Enforcement Supplement when he reached age 55.
33. Shortly after Williamson was informed by Hicks that he would not be receiving the North Carolina Law Enforcement Supplement, Williamson's attorney attempted to resolve the issue and correct Moser's mistake by sending a letter to the Commissioner of the DOT. The letter very broadly offered to the Commissioner a resolution of DOT's error, including rehiring Williamson.
34. The undisputed evidence establishes that Williamson never received an offer to return to his duties at DMV. *Page 11 
35. John Robinson, former Director of the DMV's Licensing and Theft Bureau, testified that he would have fired Williamson if he had not retired. Robinson's testimony is not credible as his testimony was impeached to an appreciable degree. He testified that he told Deputy Director Edwards that he would have fired Williamson if he had not retired, but could not remember when he had that conversation with Edwards. In contravention, Edwards testified that Robinson never told him that he would have fired Williamson if he had not retired.
36. In 1997, Williamson had been disciplined for allegedly falsifying documents and suspended for five days without pay. Despite the DOT's treatment of Williamson under the similar allegations in 1997, Robinson testified that Williamson would have been terminated had he not retired because of the nature of the charges against him in 2004. Robinson, however, failed to adequately explain why Williamson would have been fired for his alleged conduct in 2004 when he was only suspended for a week for similar conduct in 1997.
37. Defendant's contention that Williamson would have been terminated from employment absent his resignation is not well taken. Defendant's proffer that Williamson would have been terminated is predicated upon Robinson's testimony that is not credible. That Williamson was subject to discipline for his falsification of inspection reports is undisputed. However, the inference that the most likely result was Williamson's termination is speculative.
38. Without Moser's representations regarding his entitlement to the law enforcement supplement, Williamson would not have retired on March 29, 2004.
39. Williamson's law enforcement supplement was calculated by Moser to be $955.00 per month beginning at age 55 and continuing until Williamson began receiving Social Security at age 65, ten years later. No testimony was offered at trial that Moser's estimates of William's benefits were not reasonably accurate. *Page 12 
40. The greater weight of the evidence establishes that Williamson would have received the retirement supplement at the rate of $955.00 per month for ten years.
41. The greater weight of the evidence establishes that the present value of the future benefits for the balance of the ten year period shall be determined using a discount rate of 4.55% as evidenced in the 26 February 2010 amended affidavit of Frank A. Buckles, Ph.D., submitted by defendant.
 ***********
The foregoing Stipulations and Findings of Fact engender the following:
 CONCLUSIONS OF LAW
1. N.C. Gen. Stat. § 143-291(a) confers upon the Industrial Commission jurisdiction to hear tort claims against the State Board of Education, the Board of Transportation, and all other departments, institutions and agencies of the State.
2. Under the provisions of the Tort Claims Act, negligence is determined by the same rules applicable to private parties.Bolkir v. N.C. State University,321 N.C. 706, 365 S.E.2d 898 (1988).
3. To establish a claim for negligence under Tort Claims Act, Plaintiff must show that: (a) Defendant owed plaintiff duty of care; (b) actions, or failure to act, by Defendant's named employee breached that duty; (c) this breach was actual and a proximate cause of Plaintiff's injury; and (d) Plaintiff suffered damages as result of such breach. Becker v. N.C. Dept. of Motor Vehicles,177 N.C. App. 436, 628 S.E2d 446, rev. denied,362 N.C. 166, 639 S.E2d 648 (2006).
4. In the instant case, Defendant correctly admits in their Brief to the Full Commission that Moser was under a duty to provide accurate information to Williamson about his *Page 13 
eligibility for the North Carolina Law Enforcement Supplement and that Moser breached the applicable duty of care. "The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." Raritan RiverSteel Co. v. Cherry, Bekaert Holland,322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988).
5. Williamson reasonably relied upon Moser's representations regarding his eligibility for the North Carolina Law Enforcement Supplement and retired from his position. In particular, Williamson had Moser verify her representations on several occasions and Williamson's testimony is credible that he would not have retired absent Moser's assurances. "Ordinarily, the question of whether an actor is reasonable in relying on the representations of another is a matter for the finder of fact." Olivetti Corp. v. Ames BusinessSystems, Inc., 319 N.C. 534, 544, 356 S.E.2d 578, 584 (1987). What is reasonable is, as in other cases of negligence, dependent upon the circumstances. It is, in general, a matter of the care and competence that the recipient of the information is entitled to expect in the light of the circumstances and this will vary according to a good many factors. The question is one for the fact finder, unless the facts are so clear as to permit only one conclusion. Marcus Bros. Textiles, Inc. v. PriceWaterhouse, L.L.P, 350 N.C. 214, 225, 513 S.E.2d 320, 327 (1999)
6. Moser's negligent misrepresentation was a proximate cause of Williamson's damages. Williamson would not have retired absent the Moser's incorrect assurances that Williamson's supplemental retirement benefit would start at age 55 and, under the facts of this case, continue to age 65. Proximate cause is a cause which in natural and continuous sequence produced the plaintiff's injury, without which the injury would not have occurred and one from which a person of ordinary prudence could have reasonably foreseen that consequences of an *Page 14 
injurious nature would result under all the facts as they existed. Foreseeability is a requisite of proximate cause. Nance v.Parks, 266 N.C. 206, 146 S.E.2d 24 (1966).
7. Defendant's argument is not well taken that Williamson has not proven damages because Moser's calculation of benefits was an estimate based on assumptions as to Williamson working to age 65. Williamson's proof of damages was reasonably certain as Moser's calculation of benefits appear reasonably reliable, and not impeached by other testimony, and based upon Williamson's credible testimony that he intended to work to age 65. A tortfeasor "is responsible for all damages directly caused by his misconduct, and for all indirect or consequential damages which are the natural and probable effect of the wrong, under the facts as they exist at the time the same is committed and which can be ascertained with areasonable degree of certainty." Binder v. General MotorsAcceptance Corp.,222 N.C. 512, 514, 23 S.E.2d 894, 895 (1943) (quoting Conrad v.Shuford, 174 N.C. 719, 721, 94 S.E. 424, 425 (1917)) (emphasis added). However, "[d]amages which are uncertain and speculative . . . are too remote to be recoverable." Johnson v. Atlantic CoastLine R.R. Co., 184 N.C. 101, 105, 113 S.E. 606, 608 (1922).
8. Williamson's measure of damage is $955.00 per month from January, 2008 through the filing date of this Order. As to future benefits, damages are the present value of the future benefits for the balance of the ten year period; 95 months multiplied by $955.00/month, that amount discounted using a rate of 4.55%, results in a present value of $76,062.59. Watts v. North Carolina Dept. ofEnvironment and Natural Resources,182 N.C. App. 178, 641 S.E.2d 811 (2007), a'ffd and modified,362 N.C. 497, 666 S.E.2d 752 (2008); Watson v. Seaboard Air LineRy., 133 N.C. 188, 45 S.E. 555 (1903).
 *********** *Page 15 
The foregoing Stipulations, Findings of Fact and Conclusions of Law engender the following:
 ORDER
1. The defendant shall pay to the plaintiff $955.00 per month from January, 2008 through the filing date of the prior order, or 11 January 2010. As to future benefits, defendant shall pay to the plaintiff a lump sum of $76,062.59.
2. Defendant shall the pay the costs.
This the 8th day of March 2010.
 S/___________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER